UNITED STATES

v.

Shannon L. SCHLAMER, 329 80 2496, Lance Corporal (E–3), U.S. Marine Corps.

NMCM 96 00212.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 23 May 1995.

Decided 10 Nov. 1997.

LT Steven B. Fillman, JAGC, USN, Appellate Defense Counsel.

Richard T. McNeil, Civilian Defense Counsel.

LTJG Robert Attanasio, JAGC, USNR, Appellate Defense Counsel.

LT Randy S. Kravis, JAGC, USNR, Appellate Government Counsel.

LCDR Christian L. Reismeier, JAGC, USN, Appellate Government Counsel.

Before CLARK, Senior Judge, and SEFTON and OLIVER, JJ.

OLIVER, Judge:

A general court-martial composed of officer and enlisted members convicted the appellant, contrary to his pleas, of several serious crimes stemming from a violent attack on a woman Marine. These were: unlawful possession of various weapons, premeditated murder, aggravated assault, and unlawful entry, in violation of Articles 92, 118, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 918, 928, and 934 (1994)[hereinafter UCMJ]. The panel adjudged a sentence of confinement for life, a dishonorable discharge, total forfeitures, and reduction to the lowest enlisted pay grade. The convening authority approved the sentence and, except for the punitive discharge, ordered it executed. This case is before us for review under Article 66, UCMJ, 10 U.S.C. § 866.

### Background Facts

Sometime between midnight and the early morning hours of 16 October 1993 Lance Corporal Beverly Gardner was brutally murdered in her barracks room at Camp Lejeune, North Carolina. Although she had been strangled and assaulted, she died because someone had cut her throat all the way to her backbone. After her roommate discovered her body about 1130 that morning, emergency medical personnel tried to revive her. Shortly after she was declared dead, Naval Criminal Investigative Service (NCIS) investigators began to gather evidence and conduct interviews.

A comprehensive investigation, involving scores of agents, revealed several possible suspects. Since the appellant had been reported knocking on doors in the women's barracks around 0200, the NCIS interviewed him, along with hundreds of other possible witnesses. The investigators believed he had been less than candid about what he had been doing that morning, and the investigators discovered what appeared to be blood on a shirt they found during a consent search of his room. Consequently, the NCIS decided to interrogate the appellant along with several other suspects on 22 October 1993. However, the NCIS agents who interrogated the appellant admitted that, prior to that critical interview, they did not believe he was a prime suspect.

After advising the appellant of his rights under Article 31, UCMJ, 10 U.S.C. § 831, two NCIS agents began to ask the appellant questions about his version of what had happened that night. He first admitted that he had, in fact, been knocking on doors in the women's barracks, including that of the victim. After about 2 hours, the appellant first admitted that he had killed Private Gardner. He stated that after he entered her room in search of a sexual liaison, he strangled her, knocked her head against the floor, and, after returning to his room to get a knife, killed her. He confessed that he cut her throat several times, stopping only after he "felt something hard." Record at 2310.

After the NCIS agents typed up a written confession, the appellant read the document, made a minor correction, initialed it in several places, and swore to its accuracy before signing it. Prosecution Exhibit 5. He consented to comprehensive searches of his room and his car. The NCIS then took hair and fluid samples.

Shortly thereafter, the appellant repeated the details of his confession in the office of the senior investigator. Using the senior investigator as a "dummy," the appellant demonstrated how he had choked his victim, how she had struggled and then collapsed to the floor, and how he hit her head against the floor after she lost consciousness. The appellant then admitted that he left the room. However, worried about how much trouble he would be in as soon as Lance Corporal Gardner recovered, he got his knife, returned to her room, and cut her throat. Again using the senior investigator as a prop, the appellant demonstrated exactly how he committed the murder.

Through the testimony of two Navy psychiatrists who had interviewed and tested the appellant as part of a team some 16 months after the incident, the defense developed the position at trial that his confession was false. Since the doctors had determined that the appellant possessed extremely low self-esteem, they both testified that he would have signed just about anything to avoid conflict. Moreover, since they concluded that he was suffering from an alcohol-induced blackout on the night in question, they testified that he could not possibly have remembered all the details contained in his confession. They speculated that the appellant simply adopted the facts of the crime which the NCIS agents suggested, a process the psychiatrists referred to as "suggestibility" or "confabulation." Record at 2523, 2556, 2637. See Defense Exhibit PP (definitions).

On the other hand, the doctors emphasized that they were not concluding that the appellant had not committed the murder. Moreover, they testified that if he had done so, the fact that he was suffering from an alcoholic blackout did not mean he could not have premeditated the crime. Additionally, the appellant admitted to both of his doctors that

he recalled knocking on Lance Corporal Gardner's door and being in her room, with a knife, during the early morning hours of 16 October 1993. Record at 2533; Defense Exhibit LL.

The defense team also noted at trial and in its brief that there was little evidence corroborating the appellant's confession. None of his fingerprints were found in Lance Corporal Gardner's room. There was no trail of her blood found leading to or in his room. While several witnesses testified that they saw him knocking on doors, no one saw the appellant enter or leave the victim's room.

This does not mean, however, that there was no such evidence. The investigators found small droplets of blood, consistent with the victim's but which could not have come from the appellant, on the Avia-brand athletic shoes the appellant said that he was wearing when he committed the murder. Record at 1928, 1934–35. Two hairs, which an expert testified were "consistent with" the appellant's, were found on a chair near the victim's body. Record at 1949–50. A forensics expert testified that he found a blood stain on the outside of the right sleeve of a Nike sweatshirt the appellant said he was wearing when he committed the murder. While there was not enough even to determine if it was human or animal blood, the appellant stated that he had washed the sweatshirt after the murder, and the expert testified that a machine washing would likely have produced this result. Record at 1926–28.

A witness, who was watching television in an adjoining room, testified that he heard a muffled scream and several thuds at about 0230; this was consistent with the time the appellant stated in his confession that his victim screamed and he struck her head repeatedly against the floor. Record at 2690–92. The authorities also found a knife, which the appellant said he had used to kill Lance Corporal Gardner, beneath the passenger seat in his car. A screening test of the knife revealed that it was presumptively positive for blood. They also had found the victim's shirt in a nearby dumpster, where the appellant stated he had thrown it after cutting it off her body.

The parties fully litigated a broad range of other issues, from the estimated time of death based on the victim's body-core temperature taken hours after her body was found, to the appellant's psychological make-up, to the possible reasons why the NCIS does not normally videotape interrogations of criminal suspects.

We have completed a comprehensive review of the record of trial, the appellant's eight assignments of error,[1] and the Government's response thereto. We also heard oral argument. After careful consideration, we conclude that the findings and sentence are correct in law and fact and no error materially prejudicial to the substantial rights of the appellant was committed. We will consider each of the assigned errors in order, discussing additional relevant facts as necessary.

### Sufficiency of the Evidence of Guilt

The appellant first contends that the totality of the evidence is not sufficient to convince this court, beyond a reasonable doubt, of his guilt to the most serious offenses of which he was convicted. We disagree.

■ Article 66(c), UCMJ, 10 U.S.C. § 866(c), requires this court to determine the legal and factual sufficiency of the evidence. The test for legal sufficiency is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *Jack-*

*son v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Turner,* 25 M.J. 324, 324 (C.M.A. 1987). When applying this test, we must "draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. McGinty,* 38 M.J. 131, 132 (C.M.A.1993)(quoting *United States v. Blocker,* 32 M.J. 281, 284 (C.M.A.1991)). There is no question as to the legal sufficiency of the evidence in this case.

■ The test for factual sufficiency on appeal is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we ourselves are convinced of the accused's guilt beyond a reasonable doubt. *Turner,* 25 M.J. at 325. In ascertaining factual sufficiency, "the trial court determinations are worthy of due deference on review," since the members saw and heard the witnesses and were in the best position to judge their credibility. *United States v. Bright,* 20 M.J. 661, 664 (N.M.C.M.R.1985).

■ The appellant contends that the evidence of record is factually insufficient to establish that he unlawfully entered Lance Corporal Gardner's room, committed an aggravated assault on her person, and then killed her. We have carefully reviewed all the testimony and the other evidence in the record of trial. Even though this dedicated

1. I. THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT APPELLANT'S GUILT TO CHARGES II, III, AND IV (PREMEDITATED MURDER, AGGRAVATED ASSAULT AND UNLAWFUL ENTRY, RESPECTIVELY) AND THEIR RESPECTIVE SPECIFICATIONS.

II. THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY REFUSING TO ALLOW A QUESTION ON CROSS EXAMINATION OF A GOVERNMENT EXPERT SEROLOGIST REGARDING ONE OF HIS COLLEAGUE[']S OPINION ON HAIR COMPARISON ANALYSIS.

III. THE MILITARY JUDGE ERRED BY FAILING TO CONDUCT A DAUBERT HEARING ON THE ISSUE OF HAIR COMPARISON ANALYSIS DESPITE THE LACK OF A DEFENSE OBJECTION.

IV. THE MILITARY JUDGE ERRED IN ALLOWING THE TRIAL COUNSEL TO ELICIT THE OPINION OF A NCIS SPECIAL AGENT REGARDING THE TRUTHFULNESS OF APPELLANT'S SWORN STATEMENT.

V. THE MILITARY JUDGE ERRED BY DENYING TRIAL DEFENSE COUNSEL'S CHALLENGE FOR CAUSE AGAINST SSGT BUMGARDNER AND BY GRANTING THE GOVERNMENT'S CHALLENGE TO 1ST LT HANKS OVER DEFENSE OBJECTION.

VI. THE MILITARY JUDGE ERRED WHEN HE ALLOWED INTO EVIDENCE A POEM WRITTEN BY APPELLANT AND TESTIMONY REFERRING TO MAGAZINE PHOTOGRAPHS IN APPELLANT'S ROOM.

VII. THE MILITARY JUDGE ERRED BY ALLOWING EVIDENCE OF A BLOOD SCREENING TEST UTILIZING PHENOLPHTHALEIN WITHOUT A SUFFICIENT SHOWING OF SCIENTIFIC RELIABILITY.

VIII. THE MILITARY JUDGE ERRED IN DENYING TRIAL DEFENSE COUNSEL'S MOTION TO SUPPRESS APPELLANT'S STATEMENTS (UNWARNED AND WARNED) GIVEN TO NCIS ON 21 AND 22 OCTOBER 1993 AND ANY DERIVATIVE EVIDENCE. (Citation and references omitted.)

panel of members considered all the evidence, we would not affirm their findings unless we ourselves were convinced of the appellant's guilt.

We do not reject the appellant's proposition that false confessions can and do occasionally happen. Nor do we discount the likelihood that the NCIS agents may have suggested facts to include in the statement and that the text of the written confession was how the agents typed it, and not precisely as the appellant may have said it. However, after careful consideration of all the evidence, we believe that the appellant's verbal confession, sworn written statement, and physical demonstration, in each of which he admitted and explained how he committed these crimes, were voluntary and largely accurate.

Based on his voluntary and well corroborated confession and the other compelling evidence against him, we are convinced beyond a reasonable doubt that he committed these crimes. Therefore, this assignment of error is without merit.

## Military Judge's Refusal to Permit Question on Cross-Examination

The appellant next contends that the military judge committed prejudicial error by refusing to allow a question on cross-examination of the Government's forensic serologist. The question concerned one of his colleague's opinions as to the lack of reliability of hair-comparison analysis. We believe that the military judge properly sustained the objection.

■ The basis of the trial counsel's objection was hearsay. Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. MILITARY RULE OF EVIDENCE 801(c), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.). The defense counsel sought to use the out-of-court statement of the witness's expert colleague to argue that hair-comparison analysis is unreliable. Record at 2071. *See* Appellate Exhibit CCLI. The appropriate way to get the other expert's testimony before the court-martial is to call him as a witness so that he would be subject to the crucible of cross-examination and the members could evaluate his credibility.

In his brief the appellant argues that this was not an effort to get hearsay testimony before the court-martial. Rather, he argues that it was "merely an attempt to impeach the witness as to the evidentiary strength of his hair[-]comparison evidence." Without citing any authority, he contends that "[i]t is not uncommon to cross-examine an expert about the professional opinion of another expert as to general theories of his expertise." Assignment of Errors and Brief on Behalf of Appellant at 31. We are unwilling to accept this bald statement as reflective of the current state of the law or normal practice within the military justice system. Certainly, it would not have been uncommon, nor improper, for the appellant to have called the other expert as his witness to express a contrary opinion during direct-examination.

■ The appropriate way to challenge the opinion of an expert on cross-examination is to introduce a competing view by reference to a learned treatise or scientific article. Military Rule of Evidence 803(18) provides that the hearsay rule does not exclude "statements contained in published treatises, periodicals, or pamphlets ... established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice." We are unwilling to extend the plain language of this exception to include statements of another expert, whether made in another court proceeding or during casual conversation.

The parties could also have agreed upon a stipulation of expected testimony with respect to the other expert or upon a stipulation of fact concerning the different opinions as to the reliability of such evidence. In ruling on the objection, the military judge was not foreclosing the appellant from making the point that there was a difference of opinion among experts as to the reliability of hair-comparison analysis. He simply ruled, after a timely and specific objection, that the out-of-court statement of the competing expert was hearsay and that there was no exception which covered it.

The military judge's ruling was correct. The assignment of error is without merit.

### Plain Error in Failing to Conduct a *Daubert* Hearing

In his third assignment of error, the appellant contends that the military judge erred by failing to conduct a hearing to determine the reliability of hair-comparison analysis before permitting the members to consider such evidence.

As the appellant admitted in his brief and during oral argument, a fundamental problem with this argument is that he never requested a so-called *Daubert* hearing prior to the discussion of the hair-comparison evidence. Record at 1941–50. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Indeed, he never even objected to the introduction of this evidence. Instead, the appellant contends that the military judge committed plain error by failing to order a *Daubert* hearing or barring the introduction of the evidence *sua sponte*.

In support of this argument, the appellant notes that 4 months after his trial a court in the Eastern District of Oklahoma ruled that hair-comparison evidence, based on the forensic procedures used in that case, was unreliable. *See Williamson v. Reynolds*, 904 F.Supp. 1529, 1558 (E.D.Okla.1995), *aff'd on other grounds, Williamson v. Ward*, 110 F.3d 1508 (10th Cir.1997) (reversing ruling that hair analysis was inadmissable). This is scant legal authority for his position that the military judge committed error.

Hair-comparison evidence has long been admissible in military tribunals. *See, e.g., United States v. Mobley*, 28 M.J. 1024, 1027 (A.F.C.M.R.1989), *aff'd*, 36 M.J. 34 (C.M.A. 1992); *United States v. Pyburn*, 47 C.M.R. 896, 907, 1973 WL 14864 (A.F.C.M.R.1973). While the appellant is correct that the District Court in *Williamson* determined that the hair-comparison evidence in that case was scientifically unreliable, most courts have permitted such evidence where the examiner has followed standard procedures and made clear that the hair comparison can only be considered "consistent with" and does not constitute a "match." *See generally* Gregory G. Sarno, *Annotation, Admissibility and Weight, in Criminal Case, of Expert or Scientific Evidence Respecting Characteristics and Identification of Human Hair*, 23 A.L.R.4TH 1199 (1983).

■ Had the appellant requested a *Daubert* hearing on this issue, the military judge may well have conducted such a hearing to determine the reliability of hair-comparison analysis before admitting the evidence. However, because there was no defense request for such a hearing nor an objection to the introduction of the evidence, the issue becomes one of plain error. Failure to object to evidence offered at a court-martial constitutes a forfeiture of the objection to the admission of such evidence in the absence of plain error. MIL.R.EVID. 103(a)(1), (d). *See United States v. Prevatte*, 40 M.J. 396, 397 (C.M.A.1994). "Plain error requires, at the very least, that there be an error; it is plain; and it affects a substantial right of the accused, *i.e.*, it was prejudicial." *Id. See United States v. Riley*, 44 M.J. 671, 675–76 (N.M.Ct.Crim.App.1996).

■ We do not believe the military judge's failure to *sua sponte* order a *Daubert* hearing or bar this clearly relevant evidence was error. Moreover, even if there was error, it was not so obvious as to survive an analysis under the principles governing forfeiture contained in *United States v. Olano*, 507 U.S. 725, 733–34, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993). Therefore, this assignment of error is without merit.

### Opinion Evidence as to the Truthfulness of Appellant's Sworn Statement

In his fourth assignment of error, the appellant argues that the military judge erred in allowing the trial counsel to elicit testimony from an NCIS agent regarding his opinion as to the truthfulness of appellant's sworn statement.

During redirect examination of one of the two special agents who took the appellant's sworn written statement, the following exchange took place:

Q: Defense was also asking you about false confessions; and in your 27 years as

an officer, you've done several hundred interrogations.

During this interrogation of Lance Corporal Schlamer, did it appear to you that he was making—

CC (Mr. McNeil): Objection, Your Honor. Speculation, ultimate issue.

MJ: Overruled.

Questions by the assistant trial counsel:

Q: Did it appear to you that he was making this information up?

A: No, sir, it did not.

Q: Prosecution Exhibit 5, based on the way the interview was conducted and how he appeared, do you think this is a false confession?

A: Absolutely not, sir.

ATC: No further questions.

MJ: Recross?

Record at 2290.

 The Government argues in its brief that the appellant failed to preserve this issue by not making a timely, specific objection to the critical final question. Government Reply to Assignments of Error at 13. However, while the Government is technically correct, we are unwilling to apply waiver under Military Rule of Evidence 103(a)(1) on these facts. *See United States v. Brandell,* 35 M.J. 369, 372 (C.M.A.1992). We believe that all the trained participants at this general court-martial were aware of the direction that the assistant trial counsel was going with these questions and understood the nature of the civilian defense counsel's concern.[2] *See United States v. Fontenot,* 29 M.J. 244, 246 (C.M.A.1989).

 We find that the military judge's implicit ruling, in permitting the NCIS agent to testify that he believed the confession the appellant gave was not "false," was not error on these facts. During his cross-examination, the civilian defense counsel had spent considerable effort to make it appear that the NCIS agent had coerced an unreliable confession from the appellant and was being untruthful in his testimony as to how

he and his colleague had obtained it. While the well established rule is that a witness may not comment at trial on the truthfulness of another's statement, *United States v. Adkins,* 5 U.S.C.M.A. 492, 499, 18 C.M.R. 116, 123, 1955 WL 3293 (1955), this is largely because "the jury is the lie detector." *United States v. Cameron,* 21 M.J. 59, 63 (C.M.A.1985)(quoting *United States v. Barnard,* 490 F.2d 907, 912 (9th Cir.1973)). In the instant case, the members were not present during the taking of the confession (nor was it video or audiotaped, as the defense repeatedly emphasized). The trier-of-fact only had the testimony of the three percipient witnesses to provide details as to the circumstances of the written, oral, and demonstrative confessions. Under these circumstances, we believe that the agent's stated conclusion, that everything about the taking of the confession and the appellant's demeanor during the taking of it convinced him it was reliable, was not objectionable.

 Moreover, even if the military judge erred by not barring the NCIS agent from answering the final question on redirect, we do not find any prejudice to the substantial rights of the appellant. *United States v. Cobb,* 45 M.J. 82, 86–87 (1996). The military judge has broad discretion to make rulings on the admission or exclusion of evidence. *United States v. Garcia,* 44 M.J. 27, 31 (1996). We conclude that any error the military judge may have made was a nonconstitutional error. Because we believe it could not have had a substantial impact on the outcome of the case, it was harmless. *Cobb,* 45 M.J. at 86; *see Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946).

There are two key reasons why we believe the agent's response was harmless: First, the conclusory answer which the agent gave added nothing to the thrust of the earlier testimony he and the other NCIS agents had given. They all testified that the appellant seemed to have no trouble remembering what had happened that night and seemed to be responding freely to the questions posed.

---

2. Of course, as the appellant has admitted in his brief, it would have been better had his civilian defense counsel articulated the proper basis for objection and objected specifically to each objectionable question.

Moreover, it was obvious from the agents' testimony and the NCIS decision to focus the investigation immediately following the confession that everyone involved in the investigation believed that the confession was truthful and accurate. Second, the appellant had developed the extensive testimony from two Navy doctors, who both had spent many hours analyzing interviews with and tests they had conducted on the appellant. The doctors also relied on background information developed from the defense's investigator. They concluded that the confession the appellant gave NCIS was neither accurate nor reliable. It was therefore reasonable, and substantially harmless, for the Government to have one of the agents present at the confession testify to the contrary.

We conclude there was no error. Even if we assume error, we find such error harmless. This assignment of error is without merit.

### Challenges for Cause

The appellant next contends that the military judge erred in denying his challenge for cause against Staff Sergeant Bumgardner and in granting a Government challenge for cause against First Lieutenant Hanks. The record of trial does not support the appellant's claims that the military judge abused his discretion in either ruling.

 As a general rule military judges should be liberal in granting challenges for cause. *United States v. Jobson*, 31 M.J. 117, 122 (C.M.A.1990) (Sullivan, J., concurring). *See United States v. Glenn*, 25 M.J. 278, 279 (C.M.A.1987) ("challenges for cause are to be liberally granted.") At the same time, appellate courts must

> give a military judge great deference because we recognize that he has observed the demeanor of the participants in the voir dire and challenge process. Because we give the military judge great deference, we will overturn his ruling on a challenge only if we find a clear abuse of discretion.

*United States v. White*, 36 M.J. 284, 287 (C.M.A.1993). Chief Judge Cox has written that he "would, almost always, defer to the discretion of the military judge" when reviewing denials of causal challenges. *United*

*States v. Smart*, 21 M.J. 15, 21 (C.M.A.1985) (Cox, J., concurring). *But see United States v. Minyard*, 46 M.J. 229, 232 (1997)(Cox, J., concurring)(agreeing with the Court's holding that, on the facts of that case, the military judge had abused his discretion).

 We note that Staff Sergeant Bumgardner did not end up sitting on the panel because the appellant used his peremptory challenge against her. However, the defense specifically stated that had the challenge for cause been granted, it would have exercised its peremptory challenge against another member of the panel. This representation preserved the issue for appeal. RULE FOR COURTS-MARTIAL 912(f)(4), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.)[hereinafter R.C.M.]. While her answers on the members' questionnaire indicated an expectation that a criminal defendant would tell his side of the story and what appeared to be rather harsh views toward sentencing, we believe that she explained her answers adequately during individual voir dire. Record at 1395–1424.

 Turning to the challenge to First Lieutenant Hanks, the officer had admitted on his questionnaire that he had been taken to office hours earlier in his career when he was an enlisted man. Both the trial and defense counsel noted that this seemed to have affected him greatly, that "his body language and his immediate responses" indicated that he felt he had been "wrongfully accused" and that he was "embarrassed" by the experience. Record at 1020–21. In granting the Government's challenge for cause (after initially denying it), the military judge said that as a result of the potential member's inconsistent answers, he was concerned that First Lieutenant Hanks might not be impartial. Record at 1097–98.

Because the military judge articulated sound bases for both of his rulings, we find no abuse of discretion. *United States v. McLaren*, 38 M.J. 112, 118–19 (C.M.A.1993). This assignment of error is without merit.

### The Writing and Testimony About the Pictures

In his sixth assigned error, the appellant claims that the military judge erred when he

allowed into evidence a "poem" which the appellant had written and testimony referring to graphic photographs, apparently cut out of magazines, which the appellant displayed inside the door of his secretary. After carefully considering the appellant's arguments in this regard, we conclude that there was no error.

The basis for the appellant's objection to the writing and the testimony concerning the pictures is their lack of logical relevance.[3] The defense made a motion *in limine* to prevent the members from hearing about this evidence. After considering the motion and hearing evidence, the military judge ruled that the writing and testimony as to the graphic photographs were logically relevant and not substantially outweighed by the danger of unfair prejudice.

Military Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." As a general rule, a party has a right to have admitted "[a]ll relevant evidence"; on the other hand, "[e]vidence which is not relevant is not admissible." Mil. R.Evid. 402. Under Military Rule of Evidence 403, a military judge has the discretion to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members...." An appellate court reviews a military judge's rulings on the admissibility of evidence for

"abuse of discretion." *United States v. Sullivan*, 42 M.J. 360, 363 (1995).

The writing the Government introduced was a rambling 1/2-page typewritten document singing the praises of consuming excessive amounts of beer and committing violent acts against women, including murder, aggravated assault, and sexual depredations. Prosecution Exhibit 37. The two pictures, as described by witnesses who had seen them, were of (1) a woman with a pair of forceps or scissors stuck through her eyes; and (2) a woman's body in a pool of blood near an altar. The defense objected to the introduction of this evidence on the basis that it was irrelevant and, if determined to be relevant, it was unduly prejudicial. The military judge overruled these objections. Record at 570–77.

Through the testimony of the appellant's friends, the defense explained the "poem" as a bad joke he prepared in response to a friend of his who had written some love poems. Despite receiving a pointed recommendation from his best friend to get rid of the "poem," however, the appellant kept the paper in his desk drawer for several months. His friends also explained the pictures as similar to album covers or graphic posters which many Marines display in their rooms. The defense argued at trial and in their appellate brief that such a ruling would permit the Government to prosecute many modern authors, such as Stephen King, or any Marine who might choose to display graphic posters in his or her room. We do not accept the appellant's strained logic.[4]

---

3. The appellant also made an objection to testimony concerning the pictures under the "best evidence rule." Because there was unrebutted testimony that the pictures could not be located, we find absolutely no merit to that contention and will spend no further time discussing it. *See* Mil.R.Evid. 1004.

4. The defense's *reductio-ad-absurdum* argument falls of its own weight. Stephen King and most Marines with graphic posters in their rooms were not under investigation for murder. Therefore, their writings or posters are indeed irrelevant to prove or disprove a specific crime. The appellant's "poem" and display of graphic pictures requires a more focused inquiry.

Consider a similar analysis involving a different piece of evidence which the defense would

have no problem accepting as relevant in this case: the knife. Many Marines own knives. The mere ownership or possession of a knife does not generally make it more or less likely anyone committed a specific murder. However, the appellant's ownership of a knife, which he described as the murder weapon in his confession, and which was introduced at trial, is relevant. Indeed, it is relevant to make the proposition that he committed this specific murder both more and less likely. Both the prosecution and the defense spent considerable time discussing the appellant's knife in their respective arguments on findings. The trial counsel argued that the knife was the weapon to which the appellant had referred in his confession; the defense argued that the knife before the members was too

The defense misunderstands the law's extremely low threshold for determining relevance. The test for logical relevance is whether the item of evidence has any tendency whatsoever to affect the balance of probabilities of the existence of a fact of consequence. A key theory of the defense case was that the appellant was a quiet, shy, non-confrontational young man with no history of, or predisposition to engage in, violent or abusive behavior toward women. The argument the appellant makes in his brief, that in order for the writing to be logically relevant the "poem" would have had to "describe[ ] events that were duplicated at the crime scene," is untenable. See Assignment of Errors and Brief on Behalf of Appellant at 40. The evidence only needs to have some tendency to make a matter related to the resolution of the issue more or less likely.

 At the least, the "poem" opened a window into the appellant's darker thought processes. See United States v. Mann, 26 M.J. 1, 3–4 (C.M.A.1988)(holding that the possession of magazines depicting sexual conduct among children and adults was relevant and admissible in a court-martial for committing indecent acts on his 9–year–old daughter). While not a script of this crime, the appellant's writing expressed thoughts and desires similar to the events which surrounded the murder. The writing emphasized the appellant's need to consume large amounts of beer and how such drinking emboldened him to do "evil" things. It noted his desire to engage in violence against women and to feel her "warm blood all over." It explained how much it would please him to hear a woman "scream bloody murder" as he killed her. Prosecution Exhibit 37. The fact that, in the instant case, the appellant did not "see someones [sic] braines [sic] splater [sic] all over the place," "sink [his] teeth into her firm breasts while shes [sic] still alive," or engage in sexual intercourse with her dead body, does not render this writing logically irrelevant to this offense. See id. This is particularly so when used to rebut the defense's portrayal of the appellant as a quiet, demure, law-abiding Marine. The military judge concluded, as do we, that this writing was logically relevant. While its admission and consideration clearly worked to the disadvantage

of the appellant's case, its probative value was not "**substantially outweighed** by the danger of **unfair** prejudice." Mɪʟ.R.Evɪᴅ. 403 (emphasis added). See United States v. Holmes, 39 M.J. 176, 181–82 (C.M.A.1994).

 The testimony concerning the pictures is far less compelling than the writing in its logical relevance. However, we have no doubt that it was relevant within the meaning of Military Rule of Evidence 401 and the military judge ruled correctly under Military Rule of Evidence 403. This evidence helped paint a portrait of a darker side of the appellant's personality which was in sharp contrast to the placid impression the defense wished to leave in the members' minds.

We are confident that the military judge properly performed his important responsibility of making rulings on the admissibility of evidence. R.C.M. 801(a)(4). The evidence here complained of was logically relevant; the military judge did not abuse his discretion in admitting it. See Sullivan, 42 M.J. at 363. The assignment of error is without merit.

### Ruling Concerning the Blood Screening Test on the Knife

The appellant next contends that the military judge erred by allowing evidence of a blood-screening test without a sufficient showing of scientific reliability.

During the trial the defense moved to prevent the Government from introducing evidence of a blood-screening test that a forensic serologist had conducted. The expert had conducted a phenolphthalein test of the knife that the appellant stated he had used to commit the murder and which the NCIS had seized from the appellant's car. The expert testified that, while he could not see any blood on the knife under the microscope, his test indicated a presumptive positive result for blood. However, he admitted that there was insufficient material on the knife to conduct additional tests to confirm whether it was actually blood, was human or animal blood, or whether the blood was consistent with that of the victim or any other person. He also admitted that certain other materials, such as sausage residue or fresh vegetable stains, could give a "false positive."

dull to have made the clean cuts in the victim's shirt.

After entering essential findings of fact and conclusions of law, the military judge denied the defense motion and overruled the objection to the expert's testimony. As relevant evidence that there was a substance on the knife which tested positive for blood, he authorized the evidence to come in to help confirm the reliability of the appellant's confession. Record at 1898–99. The military judge then provided excellent instructions limiting the members' use of the expert's testimony in this regard. Record at 1902–04.

Our superior court has ruled that results of a luminol screening test for blood, which is substantially less reliable than the phenolphthalein test, is admissible as evidence to help corroborate a confession. *See, e.g., United States v. Burks*, 36 M.J. 447, 452 (C.M.A.1993). This court recently concluded that evidence of luminol and phenolphthalein tests was appropriately admitted at trial as presumptive evidence of the presence of blood on a pair of jeans which the perpetrator wore. *United States v. Holt*, 46 M.J. 853, 858–59 (N.M.Ct.Crim.App.1997). A major defense theory in the instant case is that the appellant's confession was inaccurate. The evidence was relevant to help the members determine whether the confession was reliable. The appellant was able to exploit in his argument to the members all the uncertainties regarding the test which the expert admitted during his testimony.

 After careful consideration, we believe that the military judge did not abuse his discretion in permitting this relevant evidence to come before the members for the limited purpose of helping to corroborate the confession. *See United States v. Hill*, 41 M.J. 596, 602 (Army Ct.Crim.App.1994). This assignment of error is without merit.

### Ruling Admitting the Appellant's Confessions and all Evidence Derived Therefrom

In a final summary assignment of error, the appellant contends that the military judge erred in denying his motion to suppress the statements he gave to NCIS on 21 and 22 October 1993 and any evidence derived from these statements. We disagree.

The appellant did not provide any additional analysis of why he believes the military judge abused his discretion in ruling that this critical evidence was admissible. We note that there was an extensive evidentiary hearing on the appellant's motion at trial. Record at 236–415. After considering all the evidence, the military judge reached essential findings of fact and conclusions of law. Appellate Exhibit CLVI. We have reviewed the factual findings and legal conclusions carefully in light of the evidence received at trial and largely adopt them as our own. We specifically find that the NCIS agents first obtained the appellant's consent and that the incriminating statements he gave them on 22 October 1993 were voluntary.

 While the NCIS agents did not advise the appellant of his Article 31, UCMJ, 10 U.S.C. § 831, rights during the interview of 21 October 1993, they were under no obligation to do so. At that point he was only one of hundreds of individuals who the investigators believed might have helpful information. When the senior investigator directed that the agents interrogate the appellant the next day as one of six or so "suspects," they appropriately warned him of his rights both orally and in writing. He waived those rights and, after further discussions with the agents, confessed orally, in a signed, sworn statement, and through a demonstrative run-through of how he killed Lance Corporal Gardner using the senior investigator as the "dummy." Although there was no legal obligation to do so, we also note that the senior investigator readvised the appellant of all his rights before requesting that he participate in the demonstration.

We conclude that the military judge did not abuse his discretion when he admitted this evidence over the appellant's objections. *Sullivan*, 42 M.J. at 363. This assignment of error is without merit.

### Conclusion

Accordingly, we affirm the findings and the sentence of this general court-martial, as approved on review below.

Senior Judge CLARK and Judge SEFTON concur.