UNITED STATES, Appellee,

v.

Shannon L. SCHLAMER, Lance
Corporal, U.S. Marine
Corps, Appellant.

No. 98–0301.
Crim.App. No. 96–0212.

U.S. Court of Appeals for
the Armed Forces.

Argued Feb. 9, 1999.

Decided Sept. 30, 1999.

GIERKE, J., delivered the opinion of the Court, in which COX, C.J., and SULLIVAN and CRAWFORD, JJ., joined. EFFRON, J., filed a dissenting opinion.

For Appellant: *Richard T. McNeil* (argued); *Lieutenant Robert Attanasio*, JAGC, USNR (on brief).

For Appellee: *Lieutenant Kevin S. Rosenberg*, JAGC, USNR (argued); *Colonel Kevin M. Sandkuhler*, USMC, and *Commander*

*Eugene E. Irvin,* JAGC, USN (on brief); Colonel *Charles Wm. Dorman,* USMC.

Judge GIERKE delivered the opinion of the Court.

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of violating a general order by possessing prohibited weapons; premeditated murder; aggravated assault; and unlawful entry, in violation of Articles 92, 118, 128, and 134, Uniform Code of Military Justice, 10 USC §§ 892, 918, 928, and 934, respectively. Although the case was referred as capital, the conviction of premeditated murder was not unanimous, thus precluding imposition of the death penalty. *See* RCM 1004(a)(2), Manual for Courts–Martial, United States (1998 edition).[1] The adjudged and approved sentence provides for a dishonorable discharge, confinement for life, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence. 47 MJ 670 (1997).

This Court granted review of the following issues:

I

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY REFUSING TO ALLOW A QUESTION ON CROSS–EXAMINATION OF A GOVERNMENT EXPERT SEROLOGIST REGARDING ONE OF HIS COLLEAGUE'S OPINION ON HAIR–COMPARISON ANALYSIS.

II

WHETHER THE MILITARY JUDGE ERRED IN ALLOWING THE TRIAL COUNSEL TO ELICIT THE OPINION OF A NAVAL CRIMINAL INVESTIGATIVE SERVICE SPECIAL AGENT REGARDING THE TRUTHFULNESS OF APPELLANT'S SWORN STATEMENT.

III

WHETHER THE MILITARY JUDGE ERRED BY DENYING TRIAL DEFENSE COUNSEL'S CHALLENGE FOR CAUSE AGAINST [STAFF SERGEANT] B AND BY GRANTING THE GOVERNMENT'S CHALLENGE TO [FIRST LIEUTENANT] H OVER DEFENSE OBJECTION.

IV

WHETHER THE MILITARY JUDGE ERRED WHEN HE ALLOWED INTO EVIDENCE A POEM WRITTEN BY APPELLANT AND TESTIMONY REFERRING TO MAGAZINE PHOTOGRAPHS IN APPELLANT'S ROOM.

For the reasons set out below, we affirm.

*General Factual Background*

Lance Corporal (LCpl) BG was murdered in her barracks room some time after midnight on October 16, 1993. She had been strangled and battered, and her throat had been cut all the way to her backbone.

Agents of the Naval Criminal Investigative Service (NCIS) interviewed appellant, along with numerous other witnesses and possible suspects, because he had been reported knocking on doors in the women's barracks around 2:00 on the morning of the murder. After waiving his rights under Article 31, UCMJ, 10 USC § 831, and being interrogated for about 2 hours, appellant admitted that he entered BG's room in search of a sexual liaison, strangled her, knocked her head against the floor and left the room, leaving BG unconscious on the floor. Concerned about being in trouble as soon as BG regained consciousness, appellant returned to his room, obtained a knife, and cut her throat several times, stopping only after he "felt something hard."

Appellant signed and swore to his written confession, consented to a search of his room and his car, and provided hair and fluid samples. Shortly thereafter, appellant re-

indicated.

---

1. Cited Manual provisions are unchanged from the version applicable at trial, unless otherwise

peated his confession in detail and, using an NCIS agent as a "dummy," demonstrated how he choked and battered BG and cut her throat.

Appellant's confession was corroborated by physical and testimonial evidence. The NCIS found small droplets of blood, consistent with BG's but not with appellant's, on appellant's shoes. They found two hairs that were "consistent with" appellant's on a chair near BG's body. They found a bloodstain on appellant's sweatshirt, but they could not determine if it was human or animal blood. In appellant's car the NCIS found a knife that tested "presumptively positive" for blood. They found BG's shirt in a nearby dumpster, where appellant said he threw it after he cut it off her body. Finally, the confession was corroborated by a witness from an adjoining room, who testified that he heard a muffled scream and several thuds at about 2:30 a.m. 47 MJ at 673–74.

### Issue I: Cross-examination of Serologist

#### Facts

Chief Warrant Officer 4 (CWO4) Werner, a forensic serologist from the United States Army Criminal Investigation laboratory, Fort Gillem, Georgia, testified about two hairs found on a chair next to BG's body that were "consistent with" appellant's. On cross-examination, defense counsel attempted to ask CWO4 Werner if he agreed with the opinion of Michael Odell, a fellow forensic serologist at the laboratory. In an unrelated court-martial, Mr. Odell had testified that "hair is not a very definitive piece of evidence." The military judge sustained the Government's objection to the question. He told defense counsel: "You can ask him what his opinion is but not ask him his opinion of somebody else just in an effort to get in that other person's opinion in to court."

#### Discussion

Appellant asserts that the purpose of the question was to test CWO4 Werner's opinion regarding the scientific reliability of hair-comparison evidence. The Government asserts that Mr. Odell's testimony in an unrelated court-martial was inadmissible hearsay.

We review the military judge's ruling on admissibility of evidence for "clear abuse of discretion." *United States v. Johnson,* 46 MJ 8, 10 (1997). A military judge has broad discretion to prevent a party from smuggling inadmissible hearsay into the case under the guise of testing the basis for expert testimony. *See United States v. Stark,* 24 MJ 381, 384–85 (CMA 1987), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 750, 98 L.Ed.2d 763 (1988). In this case, the military judge did not inhibit appellant's ability to test the basis for CW04 Werner's testimony by cross-examination, reference to treatises, periodicals or other writings under Mil.R.Evid. 803(18), Manual, *supra,* or by calling other experts, including Mr. Odell, to point out the weaknesses and limitations of hair analysis. We hold that the military judge did not abuse his discretion.

### Issue II: Testimony about Truthfulness of the Confession

#### Facts

The defense theory was that appellant's purported confession was unreliable. This theory was announced in the defense opening statement. It was developed during the defense cross-examination of Special Agent (SA) Young, who obtained a written statement from appellant. It was supported by expert testimony from two Navy psychiatrists, who testified that appellant had "extremely low self-esteem," that he was "suffering from an alcohol-induced blackout on the night" of the murder, and that "he could not possibly have remembered all the details" set out in his confession. They opined that "appellant simply adopted the facts" suggested by the NCIS agents, a process known as "suggestibility" or "confabulation." 47 MJ at 674. Finally, the defense theory of confabulation was argued at length in the defense closing argument.

The granted issue arises from the cross-examination and redirect examination of SA Young. Defense counsel extensively cross-examined SA Young about interrogation techniques, the psychological pressures exerted on persons being interrogated, and the

inhibiting circumstances inherent in any interrogation. He questioned SA Young extensively about his failure to make a videotape or audiotape of appellant's interrogation and about his failure to include certain facts contained in the interview notes in appellant's written confession.

Defense counsel established that SA Young had learned many of the facts surrounding the murder before he interrogated appellant. In response to questioning, SA Young denied suggesting that appellant had left fingerprints in the room or that he had entertained certain sexual thoughts. SA Young denied telling appellant that he was "facing the death penalty" or that "it would go easier on him" if he confessed. SA Young denied feeding appellant information about the murder or asking him leading questions. Defense counsel concluded his cross-examination of SA Young by asking the following questions:

Q. You are familiar with the concept that if someone is to confess to something, you must have some corroboration that the person committed the crime?

A. Yes, sir.

Q. Isn't it true, sir, that the reason behind that rule is that people do make false confessions?

A. Yes, sir. In this case, he provided us information that only—that I didn't know.

Q. That's your opinion, sir?

A. Yes, sir, that's my opinion.

Q. Part of the reasons these people might make false confessions is because of the interrogation techniques and the pressure on them during that interrogation?

A. I don't know that, sir. I don't think this was a false confession.

Q. Would you be embarrassed if it was?

A. Would I be embarrassed?

Q. Yes.

A. Yes, sir, I would. I sure would.

During trial counsel's redirect examination of SA Young, he elicited the following testimony:

Q. Defense was also asking you about false confessions; and in your 27 years as an officer, you've done several hundred interrogations.

During this interrogation of Lance Corporal Schlamer, did it appear to you that he was making—

CC: (Mr. McNeil): Objection, Your Honor. Speculation, ultimate issue.

MJ: Overruled.

Questions by the assistant trial counsel:

Q. Did it appear to you that he was making this information up?

A. No, sir, it did not.

Q. Prosecution Exhibit 5, based on the way the interview was conducted and how he appeared, do you think this is a false confession?

A. Absolutely not, sir.

Although defense counsel had objected to a question on the ground that it called for a speculative answer, he did not object to the question and answer regarding a "false confession."

### Discussion

Appellant first asserts that defense counsel's objection to speculative testimony was sufficient to preserve the issue. Appellant then concedes that any error in permitting SA Young to testify that appellant's confession was not false was an "evidentiary error," not error "of constitutional dimension." Final Brief at 26. Appellant argues that SA Young's testimony "was tantamount to testifying that Appellant was truthful in his confession," thus violating the prohibition against "human lie-detector" testimony. *Id.* at 28. The Government argues that the objection was not preserved for appellate review, and in any event, any error was harmless. Answer to Final Brief at 14, 15.

■ We agree with the Government that defense counsel's objection to speculative testimony was not sufficient to preserve his objection to "human lie-detector" testimony. Thus, we review for plain error.

■ To overcome waiver, appellant must convince us that (1) there was error; (2) that it was plain or obvious; and (3) that the error materially prejudiced a substantial

right. *United States v. Powell,* 49 MJ 460, 463 (1998). We will reverse for plain error only if the error had "an unfair prejudicial impact" on the findings or sentence. *Id.* at 465.

■ Both sides treated SA Young as an expert within the meaning of Mil.R.Evid. 702, based on his training and extensive experience. It is well settled that an expert may not opine that an out-of-court declaration is true. *See United States v. Hill–Dunning,* 26 MJ 260, 262 (CMA), *cert. denied,* 488 U.S. 967, 109 S.Ct. 494, 102 L.Ed.2d 531 (1988); *United States v. Petersen,* 24 MJ 283, 284–85 (CMA 1987). On the other hand, this Court has recognized that a defense theory of coached responses to questioning may open the door to prosecution rebuttal. *See United States v. Cacy,* 43 MJ 214, 218 (1995).

■ The defense cross-examination of SA Young clearly suggested that he had obtained a false confession by creating an intimidating environment, using leading questions, and suggesting facts to a suggestible suspect. The term "false confessions" was introduced during the defense cross-examination. When trial counsel asked SA Young on redirect if he obtained a "false confession," it was clear from the context that he was asking if SA Young had employed any of the techniques suggested by the defense. While it may have been improper to ask SA Young if "this [wa]s a false confession," we hold that it did not rise to the level of plain error.

### Issue III: Challenges

### Challenge of Staff Sergeant B

### Facts

Before trial, each panel member was asked to complete a comprehensive 19–page questionnaire. Appellant asserts that his challenge of Staff Sergeant (SSgt) B should have been granted, because of her answers to these three questions:

(1) In Question 6–J, she was asked, "Do you believe that an accused in a criminal case should testify or produce some evidence to prove that he or she is not guilty?" She responded, "Yes," and explained, "In any situation there are always two sides, therefore both sides should be heard."

(2) In Question 56, she was asked, "Do you believe the courts deal with criminals too severely or not severely enough?" She responded, "Not severely enough." She explained, "There should be a set punishment for a set crime. 'An eye for an eye.' Example: Rape—castration. Theft—remove hand."

(3) In Question 62, she was asked, "What is your general feeling about the death penalty?" She responded, "If you take a life, you owe a life."

In other parts of the questionnaire, SSgt B revealed that she had no legal training (Question 4D) and no legal experience (Question 5C). At the time of appellant's trial, she had never served as a member of a court-martial or as a juror in a civilian trial (Questions 6B, 6C, and 6D). She had never "been a witness in any investigation, a court-martial or a civilian court." (Question 13)

She responded that she did not "personally know any lawyers who practice criminal law, whether as a defense attorney or as a prosecutor." (Question 36) When asked "the first thing that comes to your mind when you think of a prosecuting attorney?", she responded, "Intense." (Question 38) Asked the same question about a defense attorney, she responded, "Matlock." (Question 39)

Regarding her personal beliefs, SSgt B responded that she strongly agrees with the statement, "An accused is innocent until proven guilty beyond a reasonable doubt." (Question 6–I–1) She strongly disagrees with the statement, "Regardless of what the law says, an accused in a criminal trial should be required to prove his or her innocence." (Question 6–I–4) She was asked her opinion of the State of California's decision not to seek the death penalty for O.J. Simpson, and she responded, "The punishment should fit the crime for everyone." (Question 75)

During voir dire, SSgt B was extensively questioned about her responses to Questions 6–J, 56, and 62. Regarding question 6–J, she responded as follows to questions from the military judge (MJ):

MJ: Looking at your questionnaire, I noticed that one of the questions was: Do you believe that an accused in a criminal case should testify or produce some evidence to prove that he or she is not guilty. And you wrote: Yes. In any situation, there are always two sides, therefore, both sides should be heard.

You heard me earlier saying that there's no requirement—

MEMBER (SSGT [B]): Yes, sir.

MJ: —for the accused to testify on his own behalf. Of course, he can do so if he wants to.

MEMBER (SSGT [B]): Yes, sir.

MJ: And you understand that the burden is on the Government to prove the accused guilty beyond a reasonable doubt?

MEMBER (SSGT [B]): Yes, sir.

MJ: Would you hold it against Lance Corporal Schlamer if he did not take the stand?

MEMBER (SSGT [B]): No, sir.

MJ: You wouldn't hold it against him at all?

MEMBER (SSGT [B]): No, sir, I would not.

MJ: If the Government failed to prove the accused guilty beyond a reasonable doubt, could you vote for not guilty even if Lance Corporal Schlamer did not take the stand and testify?

MEMBER (SSGT [B]): Yes, sir, I could.

MJ: Would you have a problem with that at all?

MEMBER (SSGT [B]): No, sir, I would not.

Trial counsel (TC) followed up with additional voir dire about Question 6–J, as follows:

TC: What I assume you're meaning by that [appellant not testifying], and as you've explained, is that it sounds like you're trying to be fair. If the accused wants to present some evidence and has a side of a story, you believe they should be allowed to do that?

MEMBER (SSGT [B]): Exactly, sir.

TC: But what we need to check on—as the judge has already kind of asked—is that

because of that belief, especially when you say there's two sides to every story, you need to understand that you can't anticipate or hold the accused to any requirement to tell his side of the story?

MEMBER (SSGT [B]): Yes, sir, I do understand that.

TC: So you understand that the accused has an absolute right to remain silent?

MEMBER (SSGT [B]): I understand that, and I understand that the accused is also innocent until proven guilty, sir.

TC: And you understand that the burden to prove that guilt rests with the Government—

MEMBER (SSGT [B]): Yes, sir.

TC: —and it never shifts over. Even at the end of our case, there's no requirement that any evidence or any telling of the other side of the story ever has to come from the defense. Do you understand this?

MEMBER (SSGT [B]): I understand that, sir.

TC: So it's fair to say that when you are answering those questions, you were basically saying that if the accused had something to present, you certainly wouldn't want to interfere with his opportunity to do so, but you aren't going to require the accused to present any evidence?

MEMBER (SSGT [B]): Exactly, sir.

Defense counsel did not question SSgt B about Question 6–J.

Regarding Questions 56 and 62, the military judge conducted the following voir dire:

MJ: . . . There was a question on the questionnaire about: Do you believe that the courts deal with criminals too severely or not severely enough. And you wrote: Not severely enough. I might add, like, virtually all the other court members have. You said: There should be a set punishment for a set crime. An eye for an eye; example, rape, castration; theft, remove hand. That seems awfully severe. Do you believe there should be a sentencing session where we hear further evidence about the crime?

MEMBER (SSGT [B]): Yes, sir, I do. Could you explain that a little bit more, please?

MJ: Well, you wrote that you believe there should be a set punishment for a set crime?

MEMBER (SSGT [B]): Based on all the facts, sir, yes, I do.

MJ: Well, for example, in the military, when someone's convicted of a crime, then we have another sentencing session right after that where both sides can introduce additional evidence that was not relevant to the crime itself.

In other words, the members can consider the circumstances of the crime, but they can also get to consider other things. Like the Government might bring in that an individual was previously convicted of other offenses. The defense might bring in that there were extenuating circumstances as to the crime or that he has a family, et cetera. Then the members may decide on a sentence after that.

MEMBER (SSGT [B]): Sir, like you said on the maximum penalty, one could be death, and one could be life imprisonment. Those are based on all the facts, not just the preliminary facts. I'm talking about when a judgment is passed, it should be based on all the facts down to the last fact, not just the preliminary facts; that's what I'm talking about.

MJ: It is unusual in the military or, in fact, in any system to have a minimum sentence that must be adjudged. But for particularly serious offenses, in this case premeditated murder or felony murder, we have that situation that you just repeated to me; and that's the situation where even if the death penalty is not adjudged, the accused must receive a mandatory life imprisonment. But ordinarily—that's what I was talking about—in a court-martial, there's no minimum sentence. So for example, if someone were convicted of rape, they could get a sentence from no punishment to all the way up to life imprisonment. So if you were the juror or court members in a rape case, would you automatically have already decided what the

punishment would be before you hear all the extenuating circumstances?

MEMBER (SSGT [B]): No, sir. Maybe I didn't answer that question very clearly.

MJ: Can you explain any more?

MEMBER (SSGT [B]): What I mean is regardless of who a person is, whether—or position, they should all be judged equally across the board; but if they're a celebrity or just a common person, the punishment should be based on all the facts, not just any preliminary facts for everyone.

MJ: So you think it should be fairly adjudged for all people regardless of their station in life?

MEMBER (SSGT [B]): Yes, sir, I do.

MJ: But would you—but does that also mean that you would automatically impose certain punishments without listening to all the facts and circumstances?

MEMBER (SSGT [B]): No, sir.

MJ: Now, we don't have, obviously, castration or removal of hands or any of those things as legitimate sentences. We do have the possibility of the death penalty which is obviously more severe than any of that. You also wrote on the question regarding the death penalty: If you take a life, you owe a life. And you wrote that you had held that opinion for 10 years since you came from a sheltered life in the Marine Corps. Does that mean that you would automatically adjudge the death penalty in this case if the accused is convicted of premeditated or felony murder?

MEMBER (SSGT [B]): Based on all the facts, sir.

MJ: So the answer then was, no, you would not automatically do that? I've asked a backwards question, haven't I? Let me ask it again. Have you already decided what the punishment would be if you convict the accused?

MEMBER (SSGT [B]): No, sir, I have not. I don't know all the facts.

MJ: So you'd be willing to listen to everything before you make the decision?

MEMBER (SSGT [B]): Sir, that would be part of my responsibility to listen to all the facts.

\* \* \*

MJ: I think that all of us would have some concern about your—what you wrote here about a set punishment for a set crime. So let me just get back to it one more time. We don't have set punishments for set crimes with the exception, and it is a major exception, that there's a minimum sentence of life imprisonment if an individual is convicted of felony murder or premeditated murder; but there is no set penalty of the death penalty, for example.

And if the accused is not convict[ed] of premeditated or felony murder, then, for example, unpremeditated murder, the members could decide anything from no punishment all the way up to life imprisonment. So there's no set punishment with that one exception.

MEMBER (SSGT [B]): I understand that, sir. But even those punishments are based on all the facts. There's still the minimum; there's still the maximum; and they're both based on all the facts. Like you said, even if you find somebody guilty, then you have additional information given, and there's one or two roads you can take either way.

\* \* \*

MJ: Are you open-minded then on the issue of whether the accused should or should not receive a death penalty or life imprisonment if he's convicted?

MEMBER (SSGT [B]): Yes, sir, I am.

MJ: Have you made up your mind in that regard at all?

MEMBER (SSGT [B]): No, sir, I have not.

Trial counsel continued the *voir dire* regarding SSgt B's attitude about punishment in the following dialogue:

I think we discussed—you discussed with the military judge fairly extensively that you'd said in your questionnaire that there should be a set punishment for a set crime?

MEMBER (SSGT [B]): Yes, sir.

TC: And if I interpreted your responses correctly, it sounds like that was more born out of some frustration you might have had with civilian cases or whatever where you hear about convicts getting off too lightly. Was that kind of what you were talking about there? In other words, that because there is sometimes some misuse of the range of punishments and you hear about people getting off with too light of a sentence?

MEMBER (SSGT [B]): No, sir. My opinion—or my answer was based on that it appears, from what I hear—because I have not sat down and watched the O.J. Simpson case or whatever, is that someone that popular is being very publicized, but yet, someone else's crime is equivalent, you don't even hear about it.

TC: Okay.

MEMBER (SSGT [B]): That's what I'm basing.

TC: So a lot of this is because of the O.J. Simpson circumstances that is driving some of your thoughts about when you talk about punishment in general?

MEMBER (SSGT [B]): No, sir, not at all. What I—okay. What I mean—let me clarify this.

TC: Please.

MEMBER (SSGT [B]): Is that there is already a set punishment. There's a minimum; there's a maximum; and they're both based on facts completely. And that's exactly what I mean. There's no— before an outcome comes or a finally—all the facts are presented, nothing should be ruled out. Everything should be just left and set and then all the facts should come into play afterwards.

TC: Okay. So, in other words, you believe that there should be some legal standards set for evaluating punishments?

MEMBER (SSGT [B]): There already are, sir.

\* \* \*

TC: Okay. Now, you did use the terminology, you know, "an eye for an eye"?

MEMBER (SSGT [B]): Yes, sir.

TC: Do you understand that certainly in the military system that you look at all the facts and circumstances surrounding an of-

fense and not just the nature of the offense, which is what I guess we usually think of in terms of "an eye for an eye"; and you used some examples regarding rape and theft?

MEMBER (SSGT [B]): Based on all the facts, sir. I'm not—"an eye for an eye" is based on complete facts, not just—maybe that's—that comment was—I think you missed—my interpretation of "eye for an eye" and yours might be a little different.

Although I understand that it's saying if you take one, then I get one back; but all of that's also based on facts. And the big thing behind what I believe in is if you do something, you should be prepared to pay the punishment for that crime if you're, in fact, guilty.

\* \* \*

TC: If you were determining a punishment for someone who was convicted of a theft, for example, just one of the examples you used, you're not going to stop—if I understand what you're saying correctly—you're not going to stop just when you learn: Okay, this person's guilty of a theft and then determine a set punishment. You're saying you still would want to know all the facts and circumstances—

MEMBER (SSGT [B]): Exactly, sir.

TC: —surrounding the theft?

MEMBER (SSGT [B]): Yes, sir.

\* \* \*

TC: Okay. Now, I understand, as the military judge has talked to you a little bit, that—and I guess here's where we get into what you mean by "set punishment." But the military system, you know, has the jury impose a punishment within a range, either from no punishment to the maximum punishment; or in the specific cases of capital offenses that we have here, the minimum range might be life imprisonment with the maximum being death.

MEMBER (SSGT [B]): Yes, sir, those are set punishments.

TC: So that would be acceptable, and you could certainly follow those kinds of rules:

MEMBER (SSGT [B]): Yes, sir.

TC: You understand then that as a potential jury member in this case, you will be given instructions regarding listening to the full range of punishments; and particularly if there is not a capital offense, there may be a minimum punishment that would be—in other words, no punishment at all. Would you be able to consider the full range of offenses depending on the facts and circumstances that come out in the case?

MEMBER (SSGT [B]): As the full and the least, sir?

TC: Yes.

MEMBER (SSGT [B]): Yes, sir, I would.

\* \* \*

TC: Okay. And you understand that in this case when the issue of the death penalty arises, you won't be making that decision in a vacuum; you know, we have to kind of ask you some hypothetical questions here where you don't know any of the facts. But in the actual case, the law provides that you will get instructions from the military judge, and you will have heard all the evidence before you have to make any choice regarding punishment. Do you understand that?

MEMBER (SSGT [B]): Yes, sir, I understand that.

TC: And you would, like, that's what you're telling us is the way you would want to deal and decide a punishment?

MEMBER (SSGT [B]): Yes, sir, based on all the facts.

TC: Let me just check. I'd like to ask you once again to look into some of your beliefs because we need to know this. From your responses in the questionnaire and what you just told me, would I be correct in assuming that there could be circumstances—in other words, after you've heard all the evidence that relate to the circumstances of the case, there could be circumstances where you feel that the death penalty would be an appropriate punishment?

MEMBER (SSGT [B]): If you're asking me if the possibility exists, yes, sir, it does.

The possibility exists in anything, and also the possibility exists that there would not be a death sentence but imprisonment.

\* \* \*

TC: ... And obviously since you don't know any of the circumstances surrounding this case, you don't have any preconceived notion one way or another as to whether life or death would be more appropriate?

MEMBER (SSGT [B]): No, sir. I don't know any of the facts, except the sheet was [sic] that was given to us—

\* \* \*

TC: ... And as you read those charges, you don't have any preconceived notions about what sentence might be appropriate for those crimes?

MEMBER (SSGT [B]): No, sir, I do not.

Civilian defense counsel (CC) continued the *voir dire* regarding SSgt B's sentencing philosophy, as follows:

CC (Mr. McNeil): But the questions regarding the death penalty, did you take those seriously when you wrote down your answer?

MEMBER (SSGT [B]): I think that I did not explain myself fully. I think that's something that appears to be a problem or something that's coming up right now.

\* \* \*

CC (Mr. McNeil): Do you believe that castration is an appropriate punishment for rape?

MEMBER (SSGT [B]): Depending on the facts, sir, yes, I do. That's an example.

CC (Mr. McNeil): But you think that is an appropriate punishment?

MEMBER (SSGT [B]): Based on all the facts, sir, yes, I do, pertaining to each individual. Everything—there's no set— there's always an exception to every rule. There's always an exception to every punishment. There's always two area—when you come to a road, there's always two different routes you can take.

CC (Mr. McNeil): But castrations is one of the ones you'd like to take?

MEMBER (SSGT [B]): No, sir, that's one of the ones that's possible—there's—that's one that's there. And based under the circumstances, it would apply to some people, yes, sir, I do.

CC (Mr. McNeil): So if you were involved in the state legislature some place and you had the power to somehow establish some criminal laws in a certain jurisdiction, certain state, would you like to see that castration is a potential punishment for rape?

MEMBER (SSGT [B]): Based on all the facts, yes, sir.

\* \* \*

CC (Mr. McNeil): And then you indicated that in paragraph—or question 62: If you take a life, you owe a life. Is that your belief?

MEMBER (SSGT [B]): Based on the facts, sir, to some degree, yes, it is. There's always—nothing is black and white, sir, well, to a certain degree. And in certain cases, yes, that is the case; but not in every situation. It depends on other things that might have come into play, just other circumstances; that's what I'm referring to.

Like, we're being given a set minimum and a set maximum. Well, those are set standards. Well, even though two people commit the exact same crime, there's situations surrounding that—those two people that may determine different outcomes for each person.

\* \* \*

CC (Mr. McNeil): And again I realize you don't have any facts, but we're trying to find out where your disposition lies in addition to what you said in your questionnaire. If Lance Corporal Schlamer was found guilty by this jury, and you were part of that jury, of premeditated murder by cutting Lance Corporal [BG]'s throat, would you be inclined to vote for the death penalty at that time?

MEMBER (SSGT [B]): Based on all the facts, sir?

CC (Mr. McNeil): Based upon the fact of premeditated murder by killing a female Marine with a knife?

MEMBER (SSGT [B]): Without having all the facts, sir?

CC (Mr. McNeil): Yes.

MEMBER (SSGT [B]): No.

CC (Mr. McNeil): Then why did you write down: If you take a life, you owe a life?

MEMBER (SSGT [B]): Because in certain cases it does apply, sir.

 \* \* \*

CC (Mr. McNeil): ... What about the Simpson trial? Again, assuming that Mr. Simpson—obviously we know somebody killed Nicole Brown–Simpson and another individual, Mr. Goldman; right? Would you agree with that?

MEMBER (SSGT [B]): Yes, sir.

CC (Mr. McNeil): That someone did murder those people?

MEMBER (SSGT [B]): Yes, sir.

CC (Mr. McNeil): Okay. So assuming that we knew the perpetrator, whether it was Mr. Simpson or somebody else, do you believe the death penalty would be an appropriate punishment in that case for killing those two individuals?

MEMBER (SSGT [B]): No, sir, I do not.

CC (Mr. McNeil): And why is that?

MEMBER (SSGT [B]): Because I don't have all the facts.

CC (Mr. McNeil): I have no further questions.

Defense counsel challenged SSgt B, based on her answers to questions 56 and 62 on the questionnaire. Counsel argued that "we've never seen something that extreme regarding her feelings about punishments for certain crimes." The military judge denied the challenge. He explained, "I listened to her, talked to her, and I heard her answers to both counsel. And although I certainly gave her every opportunity, and I know Mr. McNeil [civilian defense counsel] did, too, to allow her the opportunity to say that she had already made up her mind. On her own, she clearly stated that she had not. I completely believe her."

The defense then exercised a peremptory challenge against SSgt B. Defense counsel preserved the issue for appeal by announcing that, if the challenge for cause had not been denied, he would have used the peremptory challenge against some other member.

*Discussion*

Appellant asserts that SSgt B's responses to Question 6–J reflects a belief that an accused should testify, and her responses to Questions 56 and 62 reflect Draconian sentencing beliefs. Appellant argues that she adhered to those views during *voir dire* and only "appeared to back off her beliefs" because of "the extensive rehabilitation by the Military Judge and trial counsel." Final Brief at 32. The Government argues that SSgt B's answers on *voir dire* explained her views and made clear that the accused should be given the opportunity "to tell his side if he so desires," but that she strongly believed in the presumption of innocence, could follow the military judge's instructions, "and would not 'hold it against [appellant] if he did not'" testify. Answer to Final Brief at 18. The Government further argues that her answers during *voir dire* reflected an open mind on sentencing. *Id.* at 20. Accordingly, the Government asserts that the military judge did not clearly abuse his discretion by denying the challenge for cause. *Id.* at 22.

■ RCM 912(f)(1)(N) requires that a court member "be excused for cause whenever it appears that the member ... [s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." This rule includes challenges for actual bias as well as implied bias. *United States v. Napoleon*, 46 MJ 279, 283, *cert. denied*, 522 U.S. 953, 118 S.Ct. 375, 139 L.Ed.2d 292 (1997).

■ Mere distaste for certain offenses is not automatically disqualifying. *United States v. Bannwarth*, 36 MJ 265, 268 (CMA 1993). The test for actual bias is whether it "is such that it will not yield to the evidence presented and the judge's instructions." *Napoleon, supra* at 283, quoting *United States*

*v. Reynolds,* 23 MJ 292, 294 (CMA 1987). Because an accused ·"has only a single peremptory challenge, challenges for cause are to be liberally granted." *United States v. Glenn,* 25 MJ 278, 279 (CMA 1987) (citation omitted). "The question of actual bias 'is essentially one of credibility and therefore largely one of demeanor' "; thus a "military judge enjoys 'great deference because we recognize that he has observed the demeanor of the participants in the *voir dire* and challenge process.' " *Napoleon, supra* at 283. We will overturn a military judge's ruling on a challenge for actual bias "only if we find a clear abuse of discretion." *United States v. White,* 36 MJ 284, 287 (CMA 1993), *cert. denied,* 510 U.S. 1090, 114 S.Ct. 918, 127 L.Ed.2d 212 (1994).

▮▮▮ While actual bias is viewed subjectively, "through the eyes of the military judge or the court members," implied bias is viewed objectively, "through the eyes of the public." There is implied bias "when most people in the same position would be prejudiced." *United States v. Daulton,* 45 MJ 212, 217 (1996). Questions "of implied bias are reviewed under a somewhat less deferential standard." *Napoleon, supra* at 283. We focus "on the perception or appearance of fairness of the military justice system." *United States v. Dale,* 42 MJ 384, 386 (1995).

▮▮▮ Applying the foregoing principles, we hold that the military judge did not abuse his discretion by denying the challenge of SSgt B. With respect to question 6–J, SSgt B made clear that her answer on the questionnaire meant only that she thought an accused ought to have the opportunity to be heard, but that she would not draw an adverse inference if the accused elected not to testify or present evidence.

With respect to questions 56 and 62, pertaining to her sentencing philosophy, her answers clearly reflect her willingness to follow the military judge's instructions, her open mind on sentencing, and her concern with individualized sentencing "based on all the facts." She answered the questionnaire without benefit of any legal training, legal experience, or instructions from the military judge. As elicited by defense counsel, she answered the questions from the perspective of a lawmaker, stating what she thought the maximum punishment should be. Her answers on *voir dire* clearly reflect acceptance of the proposition that "there's a minimum; there's a maximum," with the actual sentence being determined "based on all the facts." In response to questioning by defense counsel, she unequivocally stated that she would not automatically vote for the death penalty and would not make up her mind until she had "all the facts."

▮▮▮ While SSgt B may have tough views on sentencing, she did not show any inflexibility. An inflexible member is disqualified; a tough member is not. *See United States v. Bannwarth, supra.*

SSgt B's responses on question 56 were out of line with the maximum penalties for rape and larceny, but her response to question 62 was consistent with Article 118 and paragraph 43e(1), Part IV, Manual, *supra.* Since rape and larceny were not charged, her views about punishment for those offenses were less significant than her views about murder. Even with respect to rape and larceny, her responses show willingness to follow instructions about the minimum and maximum and to assess punishment based on "all the facts."

SSgt B did not provide monosyllabic responses acquiescing to leading questions from trial counsel or the military judge. *Cf. United States v. Harris,* 13 MJ 288, 292 (CMA 1982) (opinion of Fletcher, J.) ("mere declarations of impartiality" not sufficient). She was not pushed by either the military judge or trial counsel into giving the "correct" answers on *voir dire.* To the contrary, she gave thoughtful answers, frequently disagreeing with her questioners or explaining her responses. The military judge specifically commented on SSgt B's credibility, saying: "I believe her." His assessment of her credibility is entitled to great deference. We hold that he did not abuse his discretion.

▮▮▮ On the question of implied bias, we likewise hold that the military judge did not abuse his discretion. It is clear from the record of trial that SSgt B's responses on the

questionnaire did not accurately reflect her views. While those responses might cause concern if considered standing alone, they would not cause a reasonable person to question the fairness of the proceedings, when considered in the context of the entire record, including her thoughtful and forthright responses on *voir dire*.

### Challenge of First Lieutenant H

In his pretrial questionnaire, First Lieutenant (1st Lt) H disclosed that he had received nonjudicial punishment (NJP) for destruction of government property. (Question 14) During *voir dire*, 1st Lt H was questioned about the incident. He stated that it occurred in January of 1990, 5 years and 3 months before appellant's court-martial. Defense counsel asked 1st Lt H how he felt about his experience, and he responded, "It was one I hope I never go through again, sir."

Trial counsel asked 1st Lt H the following questions:

TC: If I judged your reaction to the question properly, that's why I'm asking, it appeared to be something that understandably affected you going through that office hours; is that correct?

MEMBER (1STLT [H]): Yes, sir.

TC: Do you think the matter was handled fairly by the CO [commanding officer] at that time?

MEMBER (1STLT [H]): At the time, I felt I shouldn't be there, sir. In retrospect, I think it was the right decision for the CO to make; and I think that it brought me to an awareness of my driving habits that was like a slap in the face when I needed that.

TC: So as you sit back and reflect on it now, you think that the punishment that was imposed was appropriate?

MEMBER (1STLT [H]): Yes, sir.

TC: Now, you understand that, obviously, NJP is different than a general court-martial. Do you think that looking into your own thoughts and mind that as you're sitting in this court you may have some thoughts back to when you were facing potential punishment and that might make

it difficult for you to render a decision in this case?

MEMBER (1STLT [H]): No, sir. It was an entirely different situation, sir.

TC: Do you feel comfortable sitting in judgment of another even though you weren't too comfortable while you were being judged yourself?

MEMBER (1STLT [H]): I wouldn't say I feel comfortable in it, sir. I feel it's a duty that I've been assigned, and I'll carry out that duty if I'm a member of the board, sir.

TC: I'm just wondering if you have any—I understand that. Obviously, the commanding general said you're going to be here. The presumption is that you're going to want to be here. I'm looking for—to see if you have any hesitation about sitting in that position. I'm not saying that that makes you inappropriate or anything. I'm just seeing if you have any personal concerns about that based on your own history?

MBR (1STLT [H]): No, sir.

Trial counsel challenged 1st Lt H "based on his potential for ... overidentification with the accused." Trial counsel acknowledged that 1st Lt H gave appropriate responses on *voir dire*, but argued that "his body language and his immediate responses" made it "clear that he felt that he had been at least wrongfully accused or shouldn't have been at that sort of punishment; and it appears that it would be difficult for someone to set that kind of thought aside when dealing in a case of this magnitude and hearing possible evidence that someone else is wrongfully accused."

Defense counsel opposed the challenge, arguing that "it seems clear that he's embarrassed by that, but he certainly didn't hold it against the Government." The military judge denied the challenge. Later, after ruling on several other challenges, the military judge reconsidered his ruling and noted that 1st Lt H "did give some conflicting answers as well regarding his prior NJP, although he ended up saying that he thought the CO did the right thing." After giving defense counsel opportunity to argue further in opposition

to the challenge, the military judge granted the challenge. He explained:

> I do find that he himself, being a participant in an NJP and he thought it was unfair at the time that it happened, even though later, upon reflection, I guess as he got older, thought it might be the best thing, causes me to believe that he cannot be fair and impartial in this case.

### Discussion

■■■ Appellant now asserts that the military judge abused his discretion by granting the challenge of 1st Lt H over defense objection. Appellant argues that the military judge acted inconsistently. He asserts that "if he allowed [the] challenge of 1st Lt H, he should also have granted the challenge for cause against SSgt B." Final Brief at 34.

We hold that the military judge did not abuse his discretion. Trial counsel expressed concern about 1st Lt H's body language and his responses. Defense counsel conceded that 1st Lt H appeared embarrassed. The military judge, after reflection, became concerned about 1st Lt H's reaction to his non-judicial punishment. The military judge was in the best position to judge demeanor and credibility. *See United States v. McLaren*, 38 MJ 112, 118 (CMA 1993), *cert. denied*, 510 U.S. 1112, 114 S.Ct. 1056, 127 L.Ed.2d 377 (1994). We will not reverse his judgment in the absence of a clear abuse of discretion. *See* 52 MJ at 93. In our view, the military judge, having heard 1st Lt H's responses and observed his demeanor, acted consistently with the liberal-grant mandate. *See United States v. Glenn, supra.*

Implicit in appellant's argument is an assertion that the military judge was biased in his treatment of challenges. Appellant appears to argue that the military judge was liberal in granting government challenges but stingy in granting defense challenges. We note, however, that the defense did not challenge the military judge for cause. *See* RCM 902(d)(1). On the record before us, we are satisfied that the military judge was not biased.

### Issue IV: Admission of Poem and Photographs

#### Facts

Appellant made a motion *in limine* to preclude the court members from receiving evidence about a "poem" or letter seized from appellant's room, and from hearing testimony about two graphic photographs that appellant had displayed in his barracks room at the time of the murder. The "poem" was a rambling half-page typewritten document glorifying heavy consumption of beer and committing violent acts against women, including murder, mutilation, aggravated assault, and sexual intercourse with dead women. 47 MJ at 680. The photographs were described by witnesses but could not be found at the time of trial. One photograph depicted a woman with a pair of forceps or scissors stuck through her eyes; the other depicted the corpse of a woman in a pool of blood on an altar.

The military judge denied the motion *in limine*. His findings of fact and conclusions of law were as follows:

> I find that there is evidence presented that the accused wrote the document contained in Appellate Exhibit CXL (140) and that he continued to have it in his possession on the dates of the offenses alleged against him.
>
> That he also had in his possession on the dates of the offenses alleged against him photographs, or graphic depictions, of women either being murdered or stabbed in the eye.
>
> I find that this evidence is probative and relevant on the issue of premeditation to commit murder and to rebut any defense that the murder was not the product of such consideration of the act intended or that the act was some spur of the moment decision.
>
> I find that this evidence is not substantially outweighed by any other—any unfair prejudice to the accused.
>
> This does not appear to be [Mil.R.Evid.] 404(b) evidence, since none of it is illegal or misconduct. The fact appears to be more in the line of a relevance issue and a [Mil.R.Evid.] 403 issue.

*Discussion*

 Appellant asserts that the evidence was not relevant and that any probative value was substantially outweighed by the danger of unfair prejudice. With regard to relevance, Mil.R.Evid. 401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable tha[n] it would be without the evidence." This rule establishes a low threshold of relevance. *United States v. Reece*, 25 MJ 93, 95 (CMA 1987). A military judge's determination that evidence is relevant will not be overturned unless there is a clear abuse of discretion. *United States v. Orsburn*, 31 MJ 182, 187 (CMA 1990), *cert. denied*, 498 U.S. 1120, 111 S.Ct. 1074, 112 L.Ed.2d 1179 (1991).

 Mil.R.Evid. 402 provides: "All relevant evidence is admissible," with exceptions not applicable to this case. Mil.R.Evid. 403 provides that "relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." A military judge has " 'wide discretion' in applying Mil.R.Evid. 403 . . . . [A]ppellate courts 'exercise great restraint' in reviewing a judge's decisions under [Mil.R.Evid.] 403." *United States v. Harris*, 46 MJ 221, 225 (1997).

 Applying the foregoing principles, we hold that the military judge did not abuse his discretion. The evidence was relevant on the issue of premeditation. The photographs were never displayed to the court members. The "poem" describes mutilating a woman with a knife, the weapon used to kill BG. Although it graphically describes abuse and mutilation of women, it pales in comparison to the photographic evidence of BG's death. *See United States v. Schap*, 49 MJ 317, 326–27 (1998) (books and pamphlets on knives relevant to show premeditation and intent), *cert. denied*, —— U.S. ——, 119 S.Ct. 1116, 143 L.Ed.2d 111 (1999).

*Decision*

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is affirmed.

EFFRON, Judge (dissenting):

I would reverse on the ground that the military judge erred in failing to grant the challenge to SSgt B.

The majority quotes the well-established principle that "challenges for cause are to be liberally granted." 52 MJ at 92–93, quoting *United States v. Glenn*, 25 MJ 278, 279 (CMA 1987). The liberal-grant mandate reflects the fundamental distinctions between a jury and a court-martial panel. As we noted in *United States v. Tulloch*, 47 MJ 283 (1997):

(1) courts-martial are not subject to the jury trial requirements of the Constitution; (2) military accused are tried by a panel of their superiors, not by a jury of their peers; (3) military panels are selected by the commander who convened the court-martial on a best-qualified basis and are not drawn from a random cross-section of the community; (4) military counsel are provided with only a single peremptory challenge, in contrast to the numerous peremptory challenges permitted by most civilian jurisdictions; and (5) in civilian jurisdictions, the numerous peremptory challenges are used to select a jury, but in courts-martial, a peremptory challenge is used to eliminate those already selected by the convening authority.

*Id.* at 285–86 (internal quotation marks omitted).

In the military justice system, the convening authority—who performs the critical prosecutorial task of determining which cases shall be referred to trial by court-martial—also determines the composition of the court-martial panel. Arts. 22–25, UCMJ, 10 USC §§ 822–825, respectively. The convening authority's discretion is constrained by Article 25, which provides that the convening authority shall detail for court-martial duty "such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament."

The material excerpted from the record in the majority opinion demonstrates that SSgt B was not qualified—much less "best qualified"—to exercise the judicial temperament expected of a member of a court-martial panel. Throughout the extensive voir dire by the military judge and counsel for both parties, she demonstrated a firm and unwavering support for sentences that have long been outside the accepted range of punishments in military jurisprudence, including castration of persons convicted of rape and amputation of limbs for persons convicted of theft. *See* W. Winthrop, Military Law and Precedents 437–442 (2d ed. 1920 Reprint). Although she agreed that sentences should be tailored to individual circumstances, she insisted that there were cases in which castration or amputation should be imposed as an appropriate punishment.

Lay persons selected to serve on courts-martial need not exhibit either the detailed understanding of legal concepts expected of judges or the same degree of judicial temperament expected of trained judges. Nonetheless, members of the armed forces have the right to expect that convening authorities will exercise their extraordinary panel-selection powers to exclude those who lack the type of judicial temperament necessary to ensure a fair trial on the merits and the sentencing proceeding. The "liberal grant" mandate is designed to ensure that, if information raising serious doubts about a person's qualifications comes to the attention of the court-martial, the military judge will grant the challenge to ensure compliance with the purposes of Article 25.

SSgt B's extreme views would have disqualified her from sitting on a court-martial considering rape or larceny. The majority suggests that because "rape and larceny were not charged," her extreme views were not of significance. 52 MJ at 93. I disagree. If a person is so lacking in judicial temperament that she could not sit on a case involving rape or larceny, she is hardly qualified to deal with the emotional impact of the case in which charges involved a brutal murder with significant sexual overtones. I would hold that the decision by the military judge to deny the challenge of SSgt B constituted a clear abuse of discretion.