# UNITED STATES NAVY–MARINE CORPS
## COURT OF CRIMINAL APPEALS

_____

## No. 201500332

_____

### UNITED STATES OF AMERICA
Appellee

v.

### RICHARD P. TROTTER
Petty Officer Second Class (E-5), U.S. Navy
Appellant

_____

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Captain Bethany Payton-O'Brien, JAGC, USN.
For Appellant: Lieutenant Jacqueline M. Leonard, JAGC, USN;
Lieutenant David W. Warning, JAGC, USN.
For Appellee: Captain Dale O. Harris, JAGC, USN; Lieutenant
Commander Jeremy R. Brooks, JAGC, USN; Captain Matthew
Harris, USMC; Lieutenant Taurean K. Brown, JAGC, USN.

_____

Decided 17 November 2016

_____

Before CAMPBELL, GLASER-ALLEN, and HUTCHISON, *Appellate Military Judges*

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

_____

CAMPBELL, Senior Judge:

At a contested general court-martial, officer and enlisted members convicted the appellant of a sexual abuse of a child specification and three abusive sexual contact with a child specifications—violations of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2006). The military judge dismissed one of the abusive sexual contact specifications after findings, because the offense was alleged differently on

the findings worksheet than it was on the charge sheet. The members then sentenced the appellant to 24 months of confinement, reduction to pay grade E-1, and a dishonorable discharge. The convening authority approved the findings and sentence as adjudged.

In two original assignments of error (AOEs), the appellant asserts the military judge erroneously denied challenges to remove two court-martial members for cause and that the evidence was factually insufficient to support his convictions. In a supplemental AOE, the appellant further argues the military judge erred in the findings instructions she provided to the court-martial members.[1] We disagree and affirm the findings and sentence.

## I. BACKGROUND

In 2011, during the summer after her high school freshman year, then-15-year-old BT lived in a condominium in Oxnard, California, with her younger brother, her mother, and her step-father—the appellant. She spent her summer afternoons teaching golf and playing in golf tournaments. Her mother worked outside their home between 0700 and 1700, but often phoned BT and "sometimes c[a]me home during her lunch."[2] Given his proximity and more flexible work schedule,[3] the appellant came home every day to check on BT and her then seven-year-old brother.

The siblings shared a bedroom, and BT normally slept on the top bunk bed. However, she occasionally slept on the bottom bunk to avoid struggling up the ladder. She recalled awaking once to find the underwear she had worn to bed on top of some teddy bears at the foot of her bed, but she was still wearing her pajama pants.

### A. First specification

One early summer weekday, between 1100 and 1200, BT fell asleep on a couch with her brother nearby in the same room. Someone picked her up and began carrying her. She opened her eyes and saw that it was the appellant,

---

[1] In accordance with our holding in *United States v. Rendon*, __ M.J. __, 2016 CCA LEXIS 643, at *26 (N-M. Ct. Crim. App. 1 Nov 2016), we summarily reject the supplemental AOE. *United States v. Clifton*, 35 M.J. 79 (C.M.A. 1992).

[2] Record at 429-30.

[3] Their home was approximately ten minutes from the appellant's command. A Sailor from that unit testified that they held a daily 0645 battalion accountability muster, and squad leaders had to conduct a 0900 muster following 0700-0800 unit physical training on Mondays, Wednesdays, and Fridays. Otherwise, liberty was "pretty much on the honor system," with squad leaders allowing time off for appointments or taking care of children during normal working hours at their discretion. *Id.* at 491-92.

2

who took her to his bed in the master bedroom, laid her on her back, then closed and possibly locked the bedroom door. It was common for the appellant to carry BT to her own bed when she fell asleep on the couch, but she noted at trial that he had never before brought her to the master bedroom.

The appellant lay down beside BT, grabbed her by the wrist, and made her hand stroke his penis for some time. "[C]onfused" by the situation, BT kept her eyes closed throughout the encounter.[4] She felt the skin of his penis, and the appellant held her in place when she tried to move onto her side. The appellant eventually went to the master bathroom as BT lay still with her eyes closed. She ultimately heard the bathroom door open and then the bedroom door unlock, open and close. She may have fallen asleep again, but when she "eventually got up from the bed and went out of the room," the appellant said "hello" and made her lunch.[5]

## B. Second specification

About a week later, after her mother had gone to work, BT was sleeping without covers in the bottom bunk of her bedroom, wearing a t-shirt and pajama pants. She heard her door close and lock, then felt someone lay down next to her. The person, who she knew was heavier than her brother, pulled up the covers, placed a hand on top of her shirt, grabbed one of her breasts, and pulled her in closer. She then felt a penis touching her buttocks through her pajama pants. Then her "brother knocked on the door" and "calle[d] out for his dad," confirming to BT that the person beside her was the appellant.[6] The appellant immediately took off the covers, got out of bed, unlocked the door, and left the room. After the appellant left, BT lay in bed with her eyes closed for some time before walking to the living room. Her brother was watching television, and the appellant was preparing a meal.

## C. Third specification

About a week later, "[b]etween morning and lunch,"[7] but possibly as early as 0800, BT was in her top bunk when she awoke to the sound of her bedroom door closing. She felt someone heavier than her brother climb the bed's ladder and get on top of her. Though her eyes were closed, she felt hands along both sides of her head, as if the person was in a push-up position. The person kissed the left side of her neck, slid a hand under her shirt, touched her breast, and said, "[o]h, baby," leading her to recognize the appellant by his

---

[4] *Id.* at 365-66.

[5] *Id.* at 367-68.

[6] *Id.* at 372; 428.

[7] *Id.* at 374.

3

voice.[8] Then the phone in BT's room rang, and the audio caller identification announced that her mother was calling. The appellant climbed down the ladder, answered the phone, and walked out of the room. BT lay in bed with her eyes closed. When she later entered the living room, the appellant was making her a meal.

**D. Communication with KM**

KM was BT's best friend since their middle school days, and BT thought of KM as a sister. They talked frequently, even as they attended different high schools. BT remembered communicating with KM once after the appellant touched her, but could not remember the time, date, or whether the communication was a phone call or text message. KM recalled BT calling and waking her up around the "end of June, beginning of July" late one morning while others in her house were asleep.[9] BT was "crying," and said she called right after she "woke up and felt heavy breathing on her —on her neck and she turned to see that it was her stepdad humping her."[10] KM recalled BT being "scared" of possible pregnancy, which KM explained was impossible based on what BT described. KM saw BT act uncomfortable around the appellant after the call, but BT never said anything about this happening again to KM.

**E. Aftermath**

After the incidents in the top bunk, anytime BT heard someone climb the bed ladder, she sat up, opened her eyes, and called for her brother. Otherwise, BT's life progressed normally. It involved annual vacations with the appellant and the rest of her family (accompanied by KM on one amusement park trip), competing as a member and ultimately as captain of her school's golf team, and graduating with a healthy grade point average.

In September 2012, BT's mother filed a restraining order against the appellant, who moved out of the home. A Navy Family Advocacy Program representative interviewed the family. BT "never disclosed" that the appellant had committed "any type of molestation."[11] In June 2013, BT thought her mother was going to "give [marriage to the appellant] another chance."[12] After an argument with BT, her mother took her aside and

---

[8] *Id.* at 378.

[9] *Id.* at 451-52. At the Article 32, UCMJ, hearing, KM testified that the call was "early" in the morning. *Id.* at 465.

[10] *Id.* at 453.

[11] *Id.* at 442.

[12] *Id.* at 398.

4

threatened to "kick [her] out of the house."[13] BT broke down and told her mother about the appellant's actions, starting with finding her underwear on her teddy bears. Her mother called the Oxnard Police Department, who interviewed BT. Naval Criminal Investigative Service (NCIS) took the case, and BT told KM that NCIS would contact her. BT's mother announced her intent to divorce the appellant in May 2013, and she told BT to write a statement about what happened to her to support the divorce proceedings. BT stood to get a Chevy Blazer in the settlement. The divorce was still pending during the court-martial.

## II. DISCUSSION

### A. Members challenged for cause

RULE FOR COURTS-MARTIAL (R.C.M.) 912(f)(1), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), states a "member shall be excused for cause whenever it appears that the member . . . [s]hould not sit . . . in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." This rule "encompasses both" demonstrations of "actual bias" and "implied bias." *United States v. Warden*, 51 M.J. 78, 81 (C.A.A.F. 1999) (citation and internal quotation marks omitted). "A military judge's determinations on the issue of member bias, actual or implied, are based on the totality of the circumstances particular to [a] case." *United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012) (citations and internal quotation marks omitted) (alteration in original). "The burden of establishing that grounds for a challenge exist is upon the party making the challenge." R.C.M. 912(f)(3).

In our review, we consider whether each member for whom the appellant's challenge for cause was denied—and on whom no peremptory challenge was exercised—demonstrated either actual or implied bias. *See United States v. Armstrong*, 54 M.J. 51, 53 (C.A.A.F. 2000) (holding that because "[a]ctual bias and implied bias are separate legal tests, not separate grounds for challenge," we are "not constrained by the plain-error doctrine," even where "defense counsel did not . . . specifically articulate a challenge" at trial on a theory of actual or implied bias).

However, when an appellant asserts *new grounds* for challenge against a member beyond those argued at trial, he must demonstrate that failing to excuse the member for the additional reasons was plain error. *See United States v. Bannwarth*, 36 M.J. 265, 268 (C.M.A. 1993); *United States v. Harrison*, No. ACM 38745, 2016 CCA LEXIS 431, at *23-24, unpublished op. (A.F. Ct. Crim. App. 20 Jul 2016). Plain error is obvious and materially

---

[13] *Id.* at 405.

prejudicial to a substantial right of the appellant. *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011).

Actual bias exists when a member's bias "is such that it will not yield to the evidence presented and the judge's instructions." *United States v. Napoleon*, 46 M.J. 279, 283 (C.A.A.F. 1997) (citation and internal quotation marks omitted). "Actual bias is reviewed subjectively, through the eyes of the military judge or the court members." *Warden*, 51 M.J. at 81 (citations and internal quotation marks omitted). When grounds for challenge were properly asserted at trial, a military judge's decision to deny challenge for cause on these grounds for actual bias is reviewed for an abuse of discretion. *United States v. Leonard*, 63 M.J. 398, 402 (C.A.A.F. 2006). The abuse of discretion standard calls for more than a mere difference of opinion; the challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous. *United States v. Baker*, 70 M.J. 283, 287 (C.A.A.F. 2011). A military judge receives latitude on her factual determinations of actual bias because she personally observed the members' demeanor. *Leonard*, 398 M.J. at 402.

"[I]mplied bias is viewed through the eyes of the public[,]" focusing "on the perception or appearance of fairness of the military justice system." *Warden*, 51 M.J. at 81 (citations and internal quotation marks omitted). Implied bias exists "when most people in the same position [as the challenged member] would be prejudiced." *Id.* (citations and internal quotation marks omitted). A military judge's decision to grant or deny an implied bias challenge for cause is reviewed with less deference than abuse of discretion, but more than *de novo* review. *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010). "[I]nstances in which the military judge's exercise of discretion will be reversed will indeed be rare" when she "considers a challenge based on implied bias, recognizes [her] duty to liberally grant defense challenges, and places [her] reasoning on the record." *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007).

However, less deference is given when the military judge's implied bias analysis is not comprehensive. *Id.* In *United States v. Downing*, the military judge purported to rule on implied bias by merely assessing the challenged member's demeanor and summarily concluding, "[t]here is clearly no actual bias in this case[,] folks are friends with folks all over the base, [the member] said she could clearly set that information aside and I think quite clearly that she can. The challenge . . . is denied." 56 M.J. 419, 421-22 (C.A.A.F. 2002). Since the record failed to "squarely address the essential question" of implied bias by stating whether the military judge was "satisfied that an objective public observer would find this level of friendship between the prosecutor and a member of the court-martial panel consonant with a fair and impartial system of military justice[,]" the Court of Appeals for the Armed Forces could

not "conclude . . . that the military judge actually applied the correct test for implied bias." *Id.* at 422. "In cases where less deference is accorded," our "analysis logically moves more towards a *de novo* standard of review." *United States v. Rogers*, 75 M.J. 270, 273 (C.A.A.F. 2016).

### 1. Lieutenant Commander (LCDR) T

#### a. *Voir dire* responses and defense challenge

During group *voir dire*, LCDR T, the senior panel member, agreed that he understood the explanations about the presumption of innocence and that he would follow the military judge's related instructions.[14] He disagreed with notions that "[a] person falsely accused of a crime is required to prove [his] innocence" or must testify.[15] During individual *voir dire*, LCDR T revealed that he had conducted a preliminary inquiry for a Sailor's testing positive for "methamphetamines" in a urinalysis.[16] LCDR T remarked that during the investigative interview of that Sailor, "[o]bviously, he denied taking the stuff."[17] When asked by trial defense counsel, "[w]hy do you say obviously he denied it?," LCDR T explained, "according to the San Diego drug labs, none of his prescription meds [sic] would have caused" the positive test result.[18]

Before group *voir dire* began, the military judge advised the members that they "must impartially hear the evidence,"[19] and ascertained that they would "decide this case based on evidence that's presented."[20] During group *voir dire*, LCDR T agreed with the proposition that "[m]ost teenagers lie."[21]

---

[14] *Id.* at 123 ("[Y]ou must keep open minds regarding the verdict until all of the evidence is in and you have been instructed by me as to the law. . . . I will advise you prior to your deliberations on the guilt or innocence of the accused. I will advise you that he must be presumed to be innocent until and unless his guilt is established by legal and competent evidence beyond a reasonable doubt; that in this case, if there is a reasonable doubt as to the guilt of the accused, that doubt shall be resolved in the accused's favor and he shall be acquitted."); *id.* at 125-26 ("The fact an accused may elect not to testify may not be considered adverse to the accused in any way. The burden of proof to establish the guilt of the accused beyond a reasonable doubt is on the government. That burden never shifts to the accused to establish innocence or to disprove the facts necessary to establish each element of the offenses alleged.").

[15] *Id.* at 136-37.

[16] *Id.* at 146-47.

[17] *Id.* at 147.

[18] *Id.*

[19] *Id.* at 106.

[20] *Id.* at 120.

[21] *Id.* at 135.

When asked in individual *voir dire* if "it is possible for a person to have a memory . . . that later turns out to be false," LCDR T responded, "No. I find that hard to believe."[22] Asked whether "based on your experiences, do children lie about important things that happened to them," LCDR T replied that though he thought this would be "unusual," it "[c]ould happen."[23] LCDR T also agreed that a mother could cause her child to lie.

During group *voir dire*, LCDR T indicated that he recalled hearing statements from "high-ranking officials, either in the Navy or in other services or within Congress, about sexual assault cases in the military."[24] During individual *voir dire*, he clarified that he was referring to a comment from the then-Commandant of the Marine Corps to the effect of, "we're going to act quickly to charge you or act upon [an] accusation" of sexual assault.[25] LCDR T also remembered a responsive, official clarification issued as being something to the effect of "that's not the case. We will use the due process [sic] to determine either the guilt or innocence of the accused."[26]

Trial defense counsel challenged LCDR T for actual and implied bias. He argued that LCDR T's response that the investigated Sailor "[o]bviously" denied using drugs "indicates a deep-seated belief that all accused are obviously denying doing something wrong in a case," and that LCDR T's "remember[ing] the [former] Commandant's memoranda in detail" and "the perspective [LCDT T's] taken on" the "sexual assault problem" demonstrates bias.[27]

b. Military judge's ruling

The military judge "considered the challenge for cause on the basis of both actual and implied bias and the liberal grant mandate" and denied the challenge.[28] She explained that "with regard to the investigation he had done," LCDR T "further clarified" the issue "through follow-up questioning," and he took "his duties seriously and appeared thoughtful when answering questions."[29] Regarding the memoranda from the former Commandant, the military judge found that LCDR T had not said "he, himself, agrees with" the

---

[22] *Id.* at 150.

[23] *Id.* at 150-51.

[24] *Id.* at 122.

[25] *Id.* at 141.

[26] *Id.* LCDR T attributed the clarifying comments to SECDEF or SECNAV.

[27] *Id.* at 320-21.

[28] *Id.* at 323.

[29] *Id.* at 323-24.

Commandant's position, and that he had "agreed to follow my instructions and exercise his own independent judgment and base the case upon the facts that are presented . . . by the parties here."[30]

### c. Challenges based on attitude towards presumption of innocence

The appellant now contends LCDR T should have been excused for cause based on the theory that "he expects people to lie when accused of committing a crime," or "presumes an individual has committed wrongdoing simply because they have been accused."[31] We first find that the military judge did not abuse her discretion in denying this actual bias challenge. The military judge specifically noted that LCDR T agreed to follow the instructions establishing a presumption of innocence that she would promulgate and that his demeanor and bearing suggested he would do so. Thus the military judge's determination that LCDR T would afford the appellant the presumption of innocence was neither arbitrary nor fanciful.

As the military judge made no specific findings regarding LCDR T's alleged implied bias,[32] we review *de novo* whether the record suggests a member of the public would perceive LCDR T's court-martial participation as unfair. We note that "a panel member's mistake as to the proper burden of proof in a criminal trial, without more" does not "necessarily require[] a finding of implied bias." *United States v. Woods*, 74 M.J. 238, 244 (C.A.A.F. 2015) (citation omitted). A challenged member's elaboration on initial *voir dire* responses can cure circumstances which could otherwise support a

---

[30] *Id.* at 323. "The appellant does not now challenge th[is] ruling. Accordingly, we find it to be the law of the case and we will focus our attention on the appellant's assigned error[s] . . . ." *United States v. Williams*, No. 201200248, 2013 CCA LEXIS 354, at *10 n.6, unpublished op. (N-M. Ct. Crim. App. 30 Apr 2013) (citing *United States v. Savala*, 70 M.J. 70, 77 (C.A.A.F. 2011)); *see* Appellant's Brief of 3 Mar 2016 at 8-11. Even without the appellant's waiver of this argument, it is unpersuasive in light of our holding (in the context of unlawful command influence) that where "the military judge's questions—and the members' responses wherein . . . disavowed that the [Commandant]'s comments would have any impact," any concern that the "disinterested public [would] harbor significant doubt about the fairness of the proceedings" was "sufficiently ameliorated." *United States v. Hernandez*, No. 201300313, 2014 CCA LEXIS 703, at *13, unpublished op. (N-M. Ct. Crim. App. 23 Sep 2014) (per curiam), *rev. denied*, 75 M.J. 22 (C.A.A.F. 2015); *see* Record at 141-43.

[31] Appellant's Brief of 3 Mar 2016 at 9.

[32] Though trial defense counsel did not argue that LCDR T's presumption of innocence comments constituted implied bias, we consider the appellant's assignment of this issue in light of *Armstrong*, 54 M.J. at 53. *See* Appellant's Brief at 10-11 (arguing that "LCDR [T]'s comments demonstrat[ing] he could not apply a presumption of innocence" served to "easily demonstrate implied bias").

finding of implied bias. *See United States v. Schlamer*, 52 M.J. 80, 87, 93 (C.A.A.F. 1999) (affirming military judge's denial of a challenge for cause to a member who agreed that "an accused in a criminal case should testify or produce some evidence to prove that he or she is not guilty," because the member later "made clear that her answer on the questionnaire meant only that she thought an accused ought to have the opportunity to be heard, but that she would not draw an adverse inference if the accused elected not to testify or present evidence").

Such is the case here. LCDR T's comment, "Obviously *he* denied taking the stuff,"[33] is reasonably interpreted as a reference to the particular Sailor LCDR T had investigated. When asked to elaborate, LCDR T provided his rationale for skepticism of *that Sailor's* denial—credible evidence that the medications legitimately prescribed to *that Sailor* would not have caused a positive test result for the drug at issue. A member of the public would understand why most people in LCDR T's position would be skeptical of *that Sailor's* denial without viewing the comment as a general statement about anyone accused of committing a crime. We find no implied bias.

d. Challenges based on attitude towards memory and deceit

For the first time on appeal, the appellant asserts plain error in the military judge's failure to grant the challenge based on LCDR T's inability to fairly "evaluat[e] evidence" which suggests a child witness was lying or that a witness had experienced a false memory.[34] We disagree. While LCDR T indicated he would find it "hard to believe" someone could have a false memory, he did not say he could *never* believe that someone had a false memory, or that it was *impossible* to have had one. Likewise, he opined that it was "unusual," but still possible, for a child to lie, either on her own or at her mother's behest. LCDR T's responses did not demonstrate an obvious actual bias against the presentation of false memory or fabrication evidence. Nor is it obvious that a member of the public would view the participation in this court-martial of a person in LCDR T's position as unfair.

2. Chief Warrant Officer Three (CWO3) M

a. *Voir dire* responses and defense challenge

During group *voir dire*, CWO3 M agreed that she would disregard past Sexual Assault Prevention and Response (SAPR) training when considering the facts of the appellant's case, and that she would follow the military judge's instructions if they conflicted with SAPR training.

---

[33] Record at 147 (emphasis added).

[34] Appellant's Brief at 9.

CWO3 M explained during individual *voir dire* that she volunteered to serve as a SAPR victim advocate (VA) at a previous command to help her promotion and advancement and to "help the victim."[35] After three to four days of training, she was a qualified VA during 2002-2004. But no alleged victims actually contacted her for assistance and she never handled a sexual assault case. CWO3 M understood her potential VA role as being "there to assist" the victim with "medical" and "the interview process of local law enforcement or NCIS[.]"[36] She specifically agreed to "not consider" information from her VA training when deciding the appellant's case.[37]

CWO3 M disagreed with the notion that her VA training required her to "assume the allegation that was told" by an alleged victim "was true."[38] However, she later agreed that, in light of her "training and experience," she would "tend to think" that "someone . . . reporting that they were [sic] sexually assaulted" was "telling the truth."[39] She clarified that she generally believed that people told her the truth, but understood that "[p]eople might not . . . tell the truth when they're reporting a crime."[40]

After her VA billet, CWO3 M later volunteered for collateral duty as the SAPR POC (point of contact) at a different command to help her promotion and advancement and see that training on Sailors' sexual assault "reporting options" was "properly done."[41] She served in that position during 2006-2009. She did not recall learning any "statistics" regarding sexual assault, "any type of information about the likelihood or unlikelihood of the allegations being true or not true," or that there was any "expected . . . outcome" to sexual assault cases during her one day of training for the position.[42] She again agreed to "not consider" information from her SAPR POC training when deciding the appellant's case.[43]

Unrelated to SAPR training, during group *voir dire*, CWO3 M disagreed with the assertion that "[m]ost teenagers lie."[44] In individual *voir dire*, she

---

[35] Record at 220-21.

[36] *Id.* at 207.

[37] *Id.* at 210.

[38] *Id.* at 207.

[39] *Id.* at 221.

[40] *Id.* at 222.

[41] *Id.* at 220-21.

[42] *Id.* at 209.

[43] *Id.* at 210.

[44] *Id.* at 135.

clarified that certainly "some" teenagers tell "major lies,"[45] though she had no first-hand experience since her siblings and the children in her own life tended to be honest. She also agreed it was "possible for a person to have a memory about an event" that is actually false, though she never had that experience.[46] She stated that she "tend[ed] to believe" people told the truth, unless she "physically saw it differently."[47] She agreed that children "could" lie "about important events in their lives[,]" even though she "never experienced" children close to her doing so.[48] CWO3 M also agreed that her own children could "lie to anybody," including by "exaggerat[ing]" something "that's good."[49]

Trial defense counsel challenged CWO3 M for implied bias, citing her volunteering to be a SAPR VA and POC before "indicat[ing during voir dire] that victims tend to tell the truth with respect to her duties as a victim advocate[,]" and her having "never experienced lying kids" or "a kid that has had a memory" which "turned out to be false."[50]

### b. The military judge's ruling

The military judge "considered the challenge for cause on the basis of both actual and implied bias and the mandate to liberally grant defense challenges," and denied it.[51] In explaining denial of the challenge regarding the SAPR aspects, the military judge cited CWO3 M's stated motivation to help her career by volunteering for the positions, her lack of any actual cases working with alleged victims, her willingness to "follow instructions," and her "thoughtful[ness] in her responses."[52]

### c. Challenge for cause based on SAPR VA/SAPR POC service

The military judge's ruling that CWO3 M was not actually biased from her experiences as a SAPR VA and POC was not an abuse of discretion. CWO3 M repeatedly agreed to disregard all SAPR training when considering the facts of the appellant's case, and follow the military judge's instructions if they conflicted with SAPR training. The military judge specifically

---

[45] *Id.* at 214.

[46] *Id.* at 218.

[47] *Id.* at 222.

[48] *Id.* at 219.

[49] *Id.*

[50] *Id.* at 329.

[51] *Id.* at 330.

[52] *Id.* at 331.

ascertained that CWO3 M did not actually interact with any alleged victims and generally did not remember the SAPR training information well enough for it to conflict with the military judge's instructions. *See United States v. Galvan*, No. ARMY 20140320, 2016 CCA LEXIS 214, at \*3-5, \*9-10 (A. Ct. Crim. App. 31 Mar 2016), *rev. denied*, __ M.J. __, 2016 CAAF LEXIS 650 (C.A.A.F. Aug. 17, 2016) ("Based on the circumstances, including [the member's] vague recollection of such statistics [on false reports of sexual assault], we find appellant did not meet his burden to establish that [the member] possessed actual bias.").

However, because the military judge's ruling, as in the case of LCDR T, did not fully address whether the CWO3 M's experience created an implied bias requiring excusal, we review *de novo* whether a member of the public would perceive CWO3 M's participation in the court-martial as unfair in light of her SAPR VA and POC positions.

This court reviewed a military judge's denial of a challenge for "cause due to implied bias" against a member who had served, over a seven-year period, "as a Sexual Assault Victim Intervention (SAVI) victim advocate . . . and a command Sexual Assault Prevention and Response (SAPR) liaison . . . at previous commands in her career" in *United States v. Lugo,* No. 201200102, 2013 CCA LEXIS 40, at \*2, \*4, \*8, unpublished op. (N-M. Ct. Crim. App. 29 Jan 2013) (per curiam). Even though the *Lugo* member had served as the advocate for four alleged victims in their reporting of sexual assaults, *id.* at \*4, \*7 n.2, and admitted that as a victim advocate/SAPR she "[a]bsolutely" treated those who shared allegations of sexual assault with her "as though they [we]re always telling . . . the truth," *id.* at \*5, we held that the military judge "did not abuse his discretion in denying" the challenge for cause because "no one elicited any details of her experiences as a SAVI advocate or how her experiences may have affected her perception of sexual assault offenders or victims." *Id.* at \*7. During *voir dire*, the *Lugo* member explained that "her role was only to provide support and access to services and not to determine whether any victim was actually telling her the truth[,]" and that she "could remain fair and impartial" during the court-martial "despite her experiences" as a SAPR VA/POC. *Id.* at \*7.

We find that CWO3 M's SAPR experiences did not create an implied bias. CWO3 M had less experience with actual victims, was no more predisposed to believe an alleged victim, and offered the same assurances that her aim as a VA was simply to help alleged victims obtain services as did the challenged member in *Lugo*. Given that CWO3 M had no impactful experiences as a VA and received only a few days of training several years before trial (the details of which she could no longer remember), we are confident that a member of

the public would not reasonably find participation by a person in CWO3 M's position in the appellant's court-martial to be unfair.

### d. Challenge for cause based on CWO3 M's attitude towards deceit

Because the military judge did not address on the record trial defense counsel's grounds for challenge that CWO3 M must be excused because she "never experienced lying kids" or "a kid that has had a memory" which "turned out to be false,"[53] we review this issue *de novo*. We find no actual bias in light of CWO3 M agreeing to follow the military judge's instruction to consider all evidence, and because her responses left open the possibility that some children exaggerate, some teenagers lie, and some mothers could cause their children to lie. We find no implied bias because a member of the public would not reasonably object to a member serving just because that member had not actually had a child lie to him or her. The public would view CWO3 M's recognizing the possibility that these things could happen as sufficient.

We also find no plain error in the military judge's failure to grant a challenge for cause based on the theories, raised for the first time on appeal, that CWO3 M "hesitat[ed] when asked whether a mother could cause a child to lie about something," and stated that she "does not think most teenagers lie."[54] CWO3 M's disagreement with trial defense counsel's proposition that "most teenagers lie" is not obvious error because the proposition's truth is hardly self-evident. Since CWO3 M agreed to consider all evidence, there was no obvious actual bias. Nor do we find that hesitation in answering these questions in this manner would obviously cause a member of the public to view CWO3 M's participation in the appellant's court-martial as unfair.

## B. Factual sufficiency

We review questions of legal and factual sufficiency *de novo*. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is whether, "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987) and Art. 66(c), UCMJ), *aff'd*, 64 M.J. 348 (C.A.A.F. 2007). In conducting this appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57

---

[53] *Id.* at 329.

[54] Appellant's Brief at 11-12.

M.J. at 399. The phrase "beyond a reasonable doubt" does not imply that the evidence must be free from conflict. *Rankin*, 63 M.J. at 557. "[F]actfinders may believe one part of a witness' testimony and disbelieve another. So, too, may we." *United States v. Lepresti*, 52 M.J. 644, 648 (N-M. Ct. Crim. App. 1999) (citation and internal quotation marks omitted).

The appellant argues that reasonable doubt stems from BT's motivations to lie about the sexual assaults—to help her mother obtain a divorce from him or to help herself obtain a vehicle in the divorce settlement. We disagree.

BT's trial testimony was compelling. It was partially corroborated by KM, who testified to BT describing to her some of the appellant's crimes at a time before either of the alleged motives to fabricate was relevant. The more contemporaneous account also obviates potential concerns over delayed reporting. While there are gaps in BT's memory about the details of when and where the appellant committed these acts, we find them understandable given her age at the time of the offenses, and note that BT's testimony on the key details of the acts committed against her was consistent and credible.

Reviewing the entire record, we are convinced of every element of sexual assault beyond a reasonable doubt and find the conviction legally and factually sufficient.

### III. CONCLUSION

The findings and sentence are affirmed.

Judge GLASER-ALLEN and Judge HUTCHISON concur.

For the Court



R.H. TROIDL

Clerk of Court